**ON TRACK INNOVATIONS LTD., Plaintiff,**

v.

**T–MOBILE USA, INC., Defendant.**

**12–CV–2224 (AJN)**

United States District Court, S.D. New York.

Signed March 25, 2015

Filed April 3, 2015

Clyde Alvin Shuman, Daniel J. Melman, Guy Yonay, Jessica Weili Lin, Veronica Mullally Munoz, Pearl Cohen Zedek Latzer Baratz LLP, New York, NY, for Plaintiff.

Eric J. Lobenfeld, Ira James Schaefer, Hogan & Hartson L.L.P., New York, NY, Douglas James Dixon, Hueston Hennigan LLP, John Charles Hueston, Irell & Manella LLP, Newport Beach, CA, Alexander Chester Giza, Zachary Truman Elsea, Hueston Hennigan LLP, Benjamin Mathes Haber, Ellisen Shelton Turner, Irell & Manella LLP, Los Angeles, CA, for Defendant.

## MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge

This action arises from a patent infringement dispute between On Track Innovations Ltd. ("OTI"), a developer of virtual payment systems and the current owner of U.S. Patent No. 6,045,043 ("the '043 patent"), and T–Mobile USA, Inc. ("T–Mobile"), a mobile network operator ("MNO"). OTI alleges that T–Mobile infringed the '043 patent through its sale of near field communication ("NFC") mobile phones, which, when used in conjunction with a SIM card, allow their owners to make virtual cashless payments with certain merchants.

Presently before the Court are six motions: three *Daubert* motions seeking to exclude expert testimony and three motions for summary judgment. OTI moves to exclude the testimony of Dr. Michael Allan Martin Davies, T–Mobile's rebuttal expert on issues relating to NFC technology and the market for mobile phones. Additionally, OTI submits two motions for summary judgment, one seeking summary judgment affirming T–Mobile's infringement of the '043 patent and a second dismissing T–Mobile's affirmative defenses of laches, estoppel, acquiescence, patent misuse, and inequitable conduct. On the other side, T–Mobile submits motions to exclude the expert testimony of Dr. Alyssa Apsel regarding infringement and also the testimony of Dr. Christine Meyer regarding damages. It has also filed a cross-motion for summary judgment on the issue of infringement and patent invalidity.

For the reasons set forth below, T–Mobile's motion to strike the testimony of Dr.

Apsel is DENIED. Its motion for summary judgment on non-infringement and patent validity is similarly DENIED. OTI's motion for summary judgment on infringement is GRANTED. Its motion for summary judgment on T–Mobile's fourth through ninth affirmative defenses is similarly GRANTED in its entirety. OTI's motion to strike the testimony of Mr. Davies is GRANTED IN PART and DENIED IN PART. Finally, T–Mobile's motion to strike the testimony of Dr. Meyer's is GRANTED.

## I. STANDARD OF REVIEW

Summary judgment is properly granted when, after reviewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir.2000). For summary judgment purposes, a genuine issue exists if the evidence is such that a reasonable jury could decide in the non-moving party's favor. *Id.* In the context of an infringement claim, summary judgment is appropriate when there is no dispute about the operation of the accused products. *See IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1121 (Fed.Cir.2011).

In a summary judgment setting, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence ... on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir.2009). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir.2011) (citations omitted). "More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citations and quotation marks omitted).

## II. BACKGROUND

This case concerns the alleged infringement of Patent No. 6,045,043, owned by Plaintiff On Track Innovations, Inc., by Defendant T–Mobile USA, Inc., a mobile telephone network operator that provides wireless services and that sells and distributes mobile phones. (Dkt. No. 167, Ex. 3 at 97:13–16) ("Silis Deposition").

### A. History of the '043 Patent

The application ultimately issuing as the '043 Patent was filed on December 30, 1997, naming Oded Bashan, Nehemya Itay, Ronnie Gilboa, and Moshe Aduk as inventors. (*See* Dkt. No. 138 ("Shuman Declaration"), Ex. A). Initially, on June 25, 1999, the Patent Office ("PTO") mailed a Non–Final Office Action to Helfgott & Karas, P.C., local counsel for the inventors and OTI, rejecting all pending claims as being anticipated by U.S. Patent No. 5,733,812 ("Kreft '812 Patent"). (Id. Ex. B). On September 22, 1999, Helfgott & Karas filed an Amendment and Remarks in response to the Office Action. (Id. Ex. C). In light of the Amendment and Remarks, a Notice of Allowability was mailed on October 25, 1999 and the patent itself was issued on April 4, 2000. (Id. Exs. A, D). The '043 Patent will expire on December 29, 2017. (*See* Dkt. No. 184, Ex. 4 at 4).

### B. The ISIS Mobile Wallet Technology

In 2010, T–Mobile, joined by Verizon and AT & T, formed ISIS, a company whose purpose was to promote cashless transactions made from mobile phones. (*See* Dkt. No. 179, Exs. 15–16).[1] As part of its participation in ISIS, T–Mobile sells phones capable of implementing NFC technology. It also distributes Universal Integrated Circuit Cards ("UICC" or "SIM card") that must be inserted into the NFC phones in order to facilitate cashless payments. (*See* Dkt. No. 167, Ex. 35 ¶ 16) ("Apsel Report"). ISIS then makes software, known as the ISIS Mobile Wallet, available for subscription. Subscribers with NFC phones can then make mobile payments using their phone. (*Id.*).

The NFC phones are capable of operating in "card emulation mode," but do not do so continuously. (*See* Dkt. No. 192, Ex. D ¶ 178) ("Conrad Rebuttal Report"). When operating in card emulation mode, the phone can communicate with a contactless reader as a contactless card, enabling mobile payment services. (Apsel Rep. ¶ 22). In effect, when operating in this mode, the phone replaces a physical plastic payment card. (Silis Dep. Tr. 54:22–55:21). This is "the primary function of any Isis device," as it facilitates "payment, e-cash, and transit applications." (*See* Dkt. No. 167, Ex. 26 at 42) ("ISIS Architecture"). Accordingly, "[t]he NFC hardware must support card emulation." (*Id.*)

At a general level, the hardware employed by ISIS combines a secure element on the SIM card with a processor, NFC controller, and antenna located on the phone itself. (ISIS Architecture 14). An image of this structure is below. [redacted text] (ISIS Architecture 14).[2]

A secure element is a tamper-resistant device with an embedded microprocessor chip capable of encrypting and decrypting data. It is capable of storing data securely. (Apsel Rep. ¶ 31). [redacted text] (Apsel Rep. ¶ 32; *see* Dkt. No. 167, Ex. 27 at 8 ("JVL Secure Element Requirements"); Silis Dep. Tr. at 60:11–23; Tech Tut. Tr. at 6:2–6). [redacted text] (*See* ISIS Architecture 14). Although the secure element could be integrated into the phone's circuitry in several ways, including through a removable card inserted into a phone's MicroSD card slot, T–Mobile mandates that it take the form of the SIM card due to certain advantages in portability and durability (*See* Dkt. No. 167, Ex. 31 at 3.2.3–2 ("GSMA Requirements for Single Wire Protocol"); Silis Dep. Tr. 76:1–12).

Beyond the secure element on the SIM card, the ISIS hardware incorporates the phone's general purpose processor (*See* Dkt. No. 167, Ex. 33 at Section 5.2.11) ("T–Mobile Product Requirements Document" or "PRD"). The NFC controller, also within the phone, serves to connect the antenna, the processor and the secure element. (*See* ISIS Architecture 24). All NFC phones at issue here also come complete with an NFC proximity antenna. (*See* Silis Dep. Tr. 57:9–13).

Finally, it is worth highlighting that the NFC phones facilitate data communication

---

1. The Court notes for the record that, in light on recent world events, ISIS rebranded under the name "Softcard" in September 2014. *See* Don Reisinger, *Isis Wallet becomes Softcard to avoid confusion with militant group,* CNET (Sept. 3, 2014) (available at http://www.cnet.com/news/isis-wallet-becomes-softcard-to-avoid-confusion-withmilitant-group/ ).

2. It should be noted that this comes from the "Informative" portion of the ISIS Architecture document, not the required specifications portion. It is provided merely as useful background.

through the use of "communication protocols," which Dr. Apsel explained to be a kind of common language for data communication. (Tech. Tut. Tr. at 10:1–4). Use of these protocols facilitates the interoperability of devices by ensuring they are able to communicate with one another. (*Id.* at 10:13–16). Contact communication is commonly governed by ISO 7816. (*Id.* at 13:21–22). The specifications for the secure element used by T–Mobile enabled use of the ISO 7816 protocol. (*See* Dkt. No. 167 ("Yonay Declaration"), Ex. 39 at 2.1.3). The specifications further require communications between the antenna and the SIM Card, first by transmitting contactless data with a contactless communications protocol, possibly ISO 14443, from the antenna to the NFC Controller (or antenna interface), and then from the NFC controller to the SIM card along a physical wire governed by the Single Wire Protocol ("SWP"). (*See* ISIS Architecture 42).

To be clear, the NFC phones at issue here are manufactured by third parties not involved in this suit. However, the technical specifications described are dictated by requirements and standards promulgated by ISIS and T–Mobile to phone manufacturers. For instance, ISIS distributed a document titled "Isis Architecture: Mobile NFC Device Specification," which mandates certain specifications for manufacturers who wish for their products to be compatible with the ISIS program. (*See generally* ISIS Architecture). Similarly, T–Mobile issued a Product Requirements Document, or PRD, to manufacturers also detailing certain features and abilities *required* of participating phones. (*See generally* T–Mobile PRD). These features were not chosen idly, but rather reflected

T–Mobile's technical and business needs. (*See* Barnes Dep. Tr. at 23:12–16).

## C. The Litigation

OTI commenced this action in March 2012. (*See* Dkt. No. 1). In its most recent amended complaint, OTI claims that T–Mobile sells NFC phones [3] that, when used in conjunction with the SIM cards also sold by T–Mobile, directly infringe upon claims 1, 2, 12, 24, and 25 of the '043 patent. (*See generally* 2/11/14 Am. Compl.). T–Mobile in turn counterclaims for a declaration that the NFC phones are non-infringing and that the '043 patent is invalid and unenforceable. (*See generally* 02/24/14 Answer & Counterclaim). It also raises nine affirmative defenses. (*Id.*).

On May 7, 2013, after extensive discovery, a technology tutorial was held to provide the Court with background information on the patent and its subcomponents. (*See* Dkt. No. 48). Two days later, a *Markman* hearing was held to allow the parties to present arguments concerning the scope of the '043 patent. (*See* Dkt. No. 50). On June 20, 2013, the Court issued a claim construction order that largely adopted the Plaintiff's proposed constructions of four disputed terms in the patent. (*See* Dkt. No. 52). Defendant's subsequent motion for reconsideration was denied. (*See* Dkt. No. 64).

## D. Claim Construction and the Scope of the '043 Patent

OTI alleges that design of the NFC phones and SIM cards infringe upon the claims of the '043 patent. The '043 patent describes a data transaction device having contact and contactless modes of operation. (*See* Dkt. No. 52 at 3) ("Claim

**3.** Specifically the HTC One, LG Optimus, F6, LG G2, Samsung Galaxy S Relay 4G, Samsung Galaxy S2, Samsung Galaxy S3, Samsung Galaxy S3 LTE, Samsung Galaxy 4, Samsung Galaxy Light, Samsung Note 2, Samsung note 3, and Song Xperia Z. (2/11/14 Am. Compl ¶ 9).

Constr. Or."). Specifically, the device both employs a wireless mode of operation in the form of a coil antenna wrapped around the edges of the device, allowing for near field communication, and also a contact mode of operation, in which the device's microprocessor communicates with a separate device (in this instance a phone) through a direct contact. (*Id.*) Notably, the '043 patent claims to distinguish itself through the ability to connect the semiconductor device with both the contact and contactless modes of communication through separate, dedicated lines of communication, obviating the need to use a switching element. (*Id.*) This ostensibly improved upon the switching elements employed in the prior art supplanted by the '043 Patent, namely U.S. Patent No. 5,206,495 ("Kreft '495 Patent") and the Kreft '812 Patent. (*Id.*).

In its June 10, 2013 claim construction order, the Court clarified four disputed terms relating to the '043 Patent. (*See generally* Claim Constr. Or.). First, the Court concluded that use of the word 'card' in the application's preamble was intentional and that the term should be ascribed its plain meaning, but also clarified that the preamble did not limit the scope of the claim. (*Id.* 3–10). Second, the Court interpreted the phrase "a semiconductor device for operating in said contact and contactless modes" to not restrict the physical design of the device to that of a card. (*Id.* 11–13). Third, the term "contact field" was read to be a particular subset of galvanic connections allowing data transmission between the contacts and the semiconductor device in accordance with the contact data communications protocol. (*Id.* 13–16). Moreover, the Court interpreted the term 'contacts' broadly, construing it to mean any electri-

cal connection between components, rather than T–Mobile's interpretation which narrowed the definition to a contact field requiring a card reader. (*Id.*). Finally, the phrase "allowing data transmission between the contacts and the semiconductor device in accordance with said contact data communications protocol only during said contact mode" was not read to disclaim a device that has connectivity between the contact field and the microprocessor during contactless mode. (*Id.* 17–20).

## III. DISCUSSION

The parties have presented a range of motions concerning both summary judgment and the admissibility of certain expert reports. The subject matter of these motions ranges from patent invalidity, patent infringement, affirmative defenses to patent infringement, and the computation of damages resulting from any alleged patent infringement. Because many of these motions are contingent upon one another, the Court addresses them in an order so as to first determine whether OTI holds a valid patent and whether it has been infringed.[4]

### A. T–Mobile's Motion to Strike the Testimony of Dr. Alyssa Apsel

OTI's claim for patent infringement relies principally upon the expert testimony of Dr. Alyssa Apsel. Accordingly, if this testimony is excluded, OTI's claim would fail and the remaining motions would be mooted. However, for the reasons below, T–Mobile's motion to strike is DENIED.

#### 1. Legal Standard

█ Federal Rule of Evidence 702 permits expert testimony so long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of

---

4. As a matter of clarification, when the Court refers to a party's memorandum, opposition, reply, or exhibit, it is in reference to the

document associated with the motion being discussed within that section, unless otherwise specified.

fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The rule requires district courts to "act as a gatekeeper to exclude invalid and unreliable expert testimony." *Floyd v. City of New York*, 861 F.Supp.2d 274, 286 (S.D.N.Y.2012) (quoting *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir.1999)) (internal quotation removed).

Nonetheless, "the Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 562 (S.D.N.Y.2007). In other words, a court's focus must be on the principles and methodologies underlying the expert's conclusions, rather than on the conclusions themselves. *See Floyd*, 861 F.Supp.2d at 286. In assessing whether a methodology is reliable under Rule 702, courts consider (1) "whether [the method or theory] can be (and has been) tested," (2) "whether [it] has been subjected to peer review and publication," (3) "the known or potential rate of error [associated with the technique] and the existence and maintenance of standards controlling the technique's operation," and (4) whether the method has achieved "general acceptance" with the relevant community. *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

## 2. T–Mobile's Argument Regarding the Use of Standards

T–Mobile seeks to exclude Dr. Apsel's November 4, 2013 expert report regarding infringement on the basis that it is conclusory and fails to support itself with reliable evidence. Specifically, it argues that Dr. Apsel failed to provide separate analysis for the eight different NFC phones alleged to have infringed the '043 Patent and further that she failed to provide analysis of the specific components used in these phones and the SIM cards. (T–Mobile Mem. 4–8). The real thrust of this argument is that by relying on various standards promulgated by T–Mobile, ISIS, and industry groups, rather than the actual components and circuitry of the devices, Dr. Apsel has failed to rely on "sufficient facts or data" as required by Rule 702.

As a matter of law, this contention is misguided. In *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed.Cir.2010), the Federal Circuit expressly rejected the Defendant's argument that a finding of infringement could only be based upon direct analysis of the products at issue. Rather, the *Fujitsu* court concluded that it was appropriate to rely on industry standards to demonstrate infringement so long as the devices actually practiced those standards. *Id.* at 1327. The court qualified this in two ways. First, an industry standard may "not provide the level of specificity required to establish that practicing that standard would always result in infringement." *Id.* Second, standards often contain optional provisions and compliance solely with *required* portions of a standard "would not establish that the accused infringer [chose] to implement the optional section." *Id.* at 1327–28. In other words, "[o]nly in the situation where a patent covers every possible implementation of a standard will it be enough to prove infringement by showing standard compliance." *Id.* at 1328. *See also France Telecom, S.A. v. Marvell Semiconductor, Inc.*, 12–CV–04967 (WHA)(NC), 2013 WL 1878912, at *3 (N.D.Cal. May 3,

2013) (noting that standards are admissible as proof of infringement except when they are insufficiently specific or optional).

■ The *Fujitsu* Court's logic is sound and applicable to this case. It would be "be a waste of judicial resources to separately analyze every accused product that undisputedly practices the standard." *Id.* at 1327. Indeed, on a "Isis Mobile Wallet FAQ" page on its website, T–Mobile claimed that "new phones are added all the time" to the ISIS ecosystem. (2/11/2014 Am. Compl., Ex. B). Rather than examine the unique circuitry of an ever-expanding number of phones participating in ISIS, it is appropriate to analyze the mandatory standards with which these phones must necessarily comply. If the device in question does not in fact comply with the standard, in spite of being required to do so, the "accused infringer is free to either prove that the claims do not cover all implementations of the standard or to prove that it does not practice the standard." *Id.*

T–Mobile attempts to remedy its argument in its reply by contending that a product-by-product analysis is required because Dr. Apsel's report does not conclusively demonstrate that every allegedly infringing product complied with T–Mobile's promulgated standard.[5] But this argument confuses OTI's ultimate burden in *proving* infringement with its immediate burden in demonstrating the *admissibility* of expert testimony. All OTI must demonstrate for purposes of this motion is that Dr. Apsel's report complies with Rule 702. That courts have reached conclusions regarding infringement through the use of standards is relevant to this motion insofar as it establishes that standards constitute a sufficiently reliable basis for formulating an expert opinion on the subject of infringement. It does not mean that Dr.

Apsel's report can only be admitted if it proves the entirety of OTPs case. *See, e.g., Ambrosini v. Labarraque,* 101 F.3d 129, 134 (D.C.Cir.1996) ("Rather, once an expert has explained his or her methodology, and has withstood cross-examination or evidence suggesting that the methodology is not derived from the scientific method, the expert's testimony, so long as it "fits" an issue in the case, is admissible under Rule 702 for the trier of fact to weigh.") Indeed, as the Supreme Court explained in *Daubert,* the proper remedy for "attacking shaky but admissible evidence" is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." 509 U.S. at 596, 113 S.Ct. 2786. To the extent Dr. Apsel's testimony fails to meet OTI's ultimate burden in proving infringement, that is a subject either for T–Mobile's motion for summary judgment or for trial.

Having concluded that T–Mobile and ISIS's own promulgated standards constitute reliable evidence for expert testimony regarding the circuitry of the NFC phones, the Court now turns to the actual strictures of Rule 702 as applied to Dr. Apsel's testimony.

### 3. Applying Rule 702 to Dr. Apsel's Testimony

■ Application of Rule 702 to Dr. Apsel's testimony establishes its admissibility. T–Mobile gamely attempts to argue that Dr. Apsel is not qualified as an expert on this subject matter because she "admits that mobile phones are complicated systems" and has "no particular expertise or experience with the accused products or their components" beyond her "generalized knowledge of electronics as an electrical engineering professor." (T–Mobile Mem. 6). Dr. Apsel is an associate professor of electrical engineering at Cornell University and has a Ph.D. in electrical

---

**5.** As the Court explains in assessing OTI's motion for summary judgment on infringe-

ment, Dr. Apsel does in fact demonstrate this. *See infra* Section III.B.3.

engineering from Johns Hopkins University. (Apsel Dec., Ex. A). She has published work extensively on circuit design and low power wireless communication. (*Id.*) She has also worked on several projects within the mobile phone industry, including on a project related to peer-to-peer communications. (Apsel 2014 Tr. at 61:4–17). Even if courts within the Second Circuit did not "liberally construe" the qualifications requirement, *see Nosal v. Granite Park LLC*, 269 F.R.D. 284, 287 (S.D.N.Y.2010) (citing cases), opining on the circuitry and structure of NFC technology falls well within Dr. Apsel's bailiwick.

For purposes of Rule 702(b), the Court concludes that Dr. Apsel relied on sufficient facts and data and that her use of applicable standards was appropriate under the circumstances. Although, as T–Mobile argues, she did not review documents provided by the various phone manufacturers or extensively assess the phones physically,[6] she did review a range of documents relating to standards for NFC technology, including two documents promulgated by ISIS, JVL Secure Element Requirements and ISIS Architecture; one document promulgated by T–Mobile, the PRD; and a range of documents meant to promote interoperability and standardization of NFC technology (e.g. GSMA Requirements for Single Protocol NFC Handsets, GSMA NFC UICC Requirements Specification, Technical Requirements for the Deutsche Telekom Next Generation UICC, Gemalto UpTeq Mobile NFC 2.0 data sheets, and STMicroelectronics ST33F1M data sheets). (*See* Apsel Rep. ¶¶ 3–4).

The documents promulgated by ISIS and T–Mobile established the *required* standards for NFC phone manufacturers whose products were to be included in the ISIS mobile payment program.[7] Moreover, as explained in the Court's infringement analysis, many of the industry standard documents relied upon by Dr. Apsel describe the circuitry of components used in the NFC phones, such as the STMicroelectronics semiconductor device and the Gemalto UICC. *See infra* Section III.B.3.i. Most critically for purposes of the infringement analysis, Dr. Apsel's opinion relied on the mandatory standards in these documents. T–Mobile attempts to obfuscate this fact by contending that the document "provides no details or requirements regarding the circuitry design or layout within any of the accused products," (T–Mobile Mem. 7) but never actually points to any instances where these standards, promulgated and required by T–Mobile, were not put into effect by the manufacturers.

Admittedly, *portions of these documents merely provide recommended or optional standards for manufacturers.[8]* But T–Mobile fails to highlight a single instance where Dr. Apsel relied on anything other than the mandatory provisions. Rather than come forward to high-

---

**6.** T–Mobile overstates the extent to which Dr. Apsel allegedly failed to physically inspect the phones at issue. In her deposition, she explained that she in fact did physically inspect several of the devices as part of her testimony regarding claim construction. When asked if she inspected them as part of her infringement analysis, she responded that she did so "in part." (Apsel 2014 Tr. at 57:13–22).

**7.** [redacted text] (T–Mobile PRD 5). To hammer home the non-discretionary nature of this architecture, the T–Mobile document labelled the subsection with an "(M)" meaning mandatory which, the document explained, meant that "the requirement definition is an absolute requirement of the specification … " (*Id.* 3).

**8.** Of the twenty-six architecture subsections in the T-Mobile PRD, sixteen are labelled as mandatory, eight as recommended, and two as optional. (T-Mobile PRD 5-9).

light instances where the standards relied upon by Dr. Apsel were not applicable, T–Mobile repeatedly attempts to raise some metaphysical doubt as to whether or not the standards were actually adopted by the manufacturers.[9] For purposes of admissibility T–Mobile and ISIS's own required specifications are a reliable basis for formulating an opinion on the circuitry of the phones at issue. *See Ericsson Inc. v. D–Link Sys., Inc.*, 10–CV–473, 2013 WL 4046225, at *4 (E.D.Tex. Aug. 6, 2013) (industry standard constituted sufficient evidence for the jury to conclude that Defendant's products infringed). T–Mobile's description of Dr. Apsel's opinions as "rank speculation" is not persuasive. (T–Mobile Mem. 1).

The various cases raised by T–Mobile on this issue are either inapposite or harmful to their position, such as *WiAV Networks, LLC v. 3Com Corp.*, 10–cv–03448 (WHA), 2010 WL 3895047 (N.D.Cal. Oct. 1, 2010). The plaintiff in *WiAV Networks* sued "well over five dozen corporate defendants across the United States, Canada, Japan, China, Taiwan, Belgium, Finland, and Sweden, accusing each of willfully and deliberately infringing two United States Patents." *Id.* at *1. The defendants were mostly "wholly unrelated companies with wholly unrelated products." *Id.* The question before the court was not the admissibility of expert testimony, but rather whether or not joinder of the defendants was appropriate. *Id.* at *2.

In determining joinder was inappropriate, the court concluded that it was "far from a foregone conclusion that the asserted claims in WiAV's patents [would] cover *all* implementations of the protocol" and accordingly the Plaintiff would have to prove infringement on a case-by-case basis rather than by reference to the protocol. *Id.* at *2. The court reached this conclusion after determining that "[t]he infringement issues will vary from product to product as they will invariably contain different components, from different manufacturers, with different specifications, that work in different ways." *Id.* at *3. Just the opposite is the case here. As T-Mobile's own chief principal engineer acknowledges, the NFC phones at issue here all operate under a common set of specifications, namely those promulgated in the T-Mobile PRD and ISIS Architecture, which "define ... the hardware requirements for the phones." (Silis Dep. Tr. 53:3–13).

Comparatively, *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 09–cv–157 (RGA), 2013 WL 865974, at *2 (D.Del. Mar. 7, 2013) is on point. The court there concluded that it was "possible for an expert to determine product features based on documentation." To the extent the opposing party wanted to proffer witnesses to "testify that some of the materials describe features that did not make it into the actual accused ... products," consideration of that testimony was one of several "factual questions for the jury." *Id.*[10] *See also France Telecom,*

---

**9.** Indeed, T-Mobile's arguments are undermined by the deposition testimony of their own employees. For instance, Arturo Silis, T-Mobile's principal product engineer for NFC, testified that the T-Mobile Product Requirements Document was used to 'define ... the hardware requirements for the phones.' (Silis Dep. Tr. 53 :3-13). Katherine Barnes, another T-Mobile employee, testified that the purpose of the general product requirement documents was to 'communicate requirements to [T-Mobile's] [manufacturers] and part-

ners.' (Barnes Dep. Tr. 51: 12-15). While T-Mobile contends that these employees were simply testifying in their own capacity, that argument goes to the weight, rather than the admissibility, of Dr. Apsel 's report.

**10.** It is worth noting that in XpertUniverse, the expert was ultimately not allowed to testify as to his conclusions about direct infringement because he opined that the direct infringement occurred due to consumer use of 'optional functionalities.' *Id.* The Court concluded that the expert lacked a basis for con-

*S.A. v. Marvell Semiconductor, Inc.*, 12–cv–04967 (WHA)(NC), 2013 WL 1878912, at *2 (N.D.Cal. May 3, 2013) (concluding that relying on industry standards was sufficient for plaintiff to disclose the theory of its case to defendant).

■ T–Mobile further contends that Dr. Apsel did not use, or appropriately apply, reliable methods and instead simply gave subjective, conclusory opinions.[11] However, T–Mobile's argument that Dr. Apsel's analysis is conclusory betrays T–Mobile's own desire to re-litigate issues already settled at claim construction. No fewer than four times in the pending motions, T-Mobile puts forward a novel interpretation of the term "fixedly connected," while alleging that OTI has misconstrued the Court's claim construction.[12] T–Mobile insists that that the parties agree that the term "fixedly connected" refers to a product that "at the very least" does not have a switching element in the data path between the contacts and the microprocessor. (T–Mobile Mem. 11). But T–Mobile misstates the Court's definition of that term. Nowhere in the Court's claim construction order did it suggest that the '043 patent only covered devices in which absolutely no switching element was present at all. Rather, the Court explained that "[t]he '043 patent obviates the need to use a switching device . . . to connect the microprocessor with both the contact and contactless sources of data." (Claim Constr. Or. 3). As ex-plained in that order, the advantage of this arrangement is that the "use of separate, *dedicated connections between the micro-processor and the data entry points* allows the microprocessor to (1) use different protocols for communicating through contact and contactless *mode* and (2) alter its protocol capabilities through software updates rather than hardware re-tooling." (*Id.*) (emphasis added). Accordingly, the '043 patent disclaims the use of a switching device *to the extent it is required to connect the semiconductor device itself to the contact and contactless data entry points.* T–Mobile's attempt to read the Court's general use of the term 'switching element' outside of this critical context is unpersuasive.

Their novel interpretation of the Court's claim construction in hand, T–Mobile argues that Dr. Apsel not only failed to base her opinion on reliable data, but also that, by failing to trace a circuit path demonstrating the absence of any switching element in the infringing products, Dr. Apsel failed to apply proper methods for demonstrating patent infringement. However, this argument, and their identical argument regarding claim 25, fail. In both instances Dr. Apsel relied on relevant, mandated standards from either T–Mobile or ISIS and thus met the strictures of Rule 702. *See, e.g., XpertUniverse, Inc.*, 2013 WL 865974, at *2.

cluding that the consumers necessarily used the optional functionalities. However, as the Court explains in the motions on infringement, the undisputed facts in this case demonstrate that there is no non-infringing use of the NFC phones when used in conjunction with the SIM card sold by T-Mobile. *See infra* Section III.B.3.ii.

11. As part of this argument, T-Mobile frequently draws attention to Dr. Apsel's use of the term 'belief.' The Court is not impressed with T-Mobile's appeal to the semantic minutia of Dr. Apsel's opinion. Dr. Apsel's frequent use of the term 'belief does not morph her opinion into mere conjecture. What matters is the 'substance of the expert's testimony,' and not the semantic manner in which it was conveyed. See *In re Fosamax Products Liab. Litig.*, 742 F.Supp.2d 460 (S.D.N.Y.2010).

12. While the Court addresses T-Mobile's argument in each of the four relevant motions, it addresses it in the great depth in T-Mobile's motion for summary judgment for noninfringement and patent invalidity, as that motion delves into greater detail about the technology at issue.

In conclusion, Dr. Apsel's report meets the requirements of Rule 702.

### B. Cross–Motions for Summary Judgment on Question of Infringement

Both T–Mobile and OTI move for summary judgment on the question of patent infringement. For the reasons below, T–Mobile's motion is DENIED and OTI's is GRANTED.

#### 1. T–Mobile's Motion for Summary Judgment on Infringement and Patent Invalidity

T–Mobile first asks that the Court construe the terms "semiconductor device" and "fixedly connected" as used in the '043 patent, on the basis that OTI has materially shifted their definition of those terms since claim construction. (T–Mobile Mem. 3). Next, it raises three arguments as to why it must be granted summary judgment on the question of infringement. (*Id.*). First, it contends that the NFC phones at issue are not covered by the '043 patent because their microprocessors are not "fixedly connected" to the contacts, but rather operate through a switch within the semiconductor device used in ISIS hardware. Second, T–Mobile argues that the prior art anticipates the claims if they are construed to cover products which contain switching elements internal to their semiconductor devices. Third, T–Mobile alleges that Dr. Apsel's report on infringement fails to create a genuine issue of material fact for trial.

##### i. T–Mobile's Proposed Claim Construction

■ T–Mobile argues that OTI has raised new construction claims that the court should resolve on summary judgment. Specifically, T–Mobile believes that OTI has changed their definition of the terms "semiconductor device" and "fixedly connected." OTI responds that it has not changed its definition of these terms, that

T–Mobile has waived any ability to challenge claim construction, and that the two terms at issue should simply be accorded their plain and ordinary meaning.

As OTI notes, the Court first rendered its *Markman* decision over a year ago. (Dkt. No. · 52). Prior to that, the Court considered extensive briefing, a technological tutorial, presentations, and oral arguments concerning the disputed terms. (Dkt. Nos. 22, 23, 25, 27, 30, 33, 36, 48, 50, 68). The benefit of these materials are amongst the "[s]ound practical reasons counsel[ing] against construing additional terms based on claim construction arguments raised for the first time in summary judgment briefs." *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2014 WL 252045, at *3 (N.D.Cal. Jan. 21, 2014) (noting that the Court "painstakingly adjudged the parties' claim construction disputes during the claim construction phase based on their in-depth technology tutorials and voluminous submissions of intrinsic and extrinsic evidence").

While courts have the obligation to resolve disputes regarding claim scope, the Court "fulfilled that duty when it provided a thorough claim construction opinion earlier in these proceedings." *Id.* (citing *O2 Micro Int'l v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed.Cir.2008)). *See also SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1292 (Fed.Cir. 2005) (upholding district court's decision to not to hear untimely claim construction arguments due to "broad deference to the trial court's application of local procedural rules in view of the trial court's need to control the parties and flow of litigation before it.") (quoting *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 774 (Fed.Cir. 2002)).

The Court's decision not to accept T–Mobile's invitation back down the rabbit hole of renewed claim construction is but-

tressed by the fact that T–Mobile's proffered reason for defining these terms is flawed. Simply put, the Court is not convinced that OTI has changed its interpretation of these terms or that any real dispute exists regarding their definition. T–Mobile alleges that OTI has changed their definition of the term "semiconductor device" from "any device made out of a semiconductor material" or a "microprocessor" (Dkt. No. 185 ("Haber Declaration"), Ex. 18 at 18:15–19:6, Tech. Tutorial Tr. at 7:18–8:14) to "a microprocessor or microcontroller" (Haber Decl., Ex. 7 ¶ 34). T–Mobile alleges this shift was deliberate in order to encompass the STMicroelectronics semiconductor device at issue in the NFC phones, which it contends is a micro-controller.

While T–Mobile selects various uses of the terms 'microprocessor', 'microcontroller', and 'semiconductor device' to conclude that OTI has moved the goalposts, OTI has in fact been consistent in contending that microprocessors and microcontrollers are simply certain *kinds* of semiconductor devices. This manufactured controversy is squarely undermined by the testimony of T–Mobile's own expert at the technology tutorial. Dr. Winters testified that:

> So, just to relate that **we're in agreement with OTI in terms of the definition of a semiconductor device, and Dr. Apsel's expert report, and as well as the named inventor, Mr. Itay, we agree with the definition of semiconductor device, that is the semiconductor device is well understood to include any device**; for example, a microprocessor, wired logic chip, or other types of semiconductor chips made of semiconductor material.

And during the deposition of Mr. Itay, a question was asked, "Is a microprocessor a semiconductor device?" And the answer was, "Yes, correct."

**Next, "Is a micro controller a semiconductor device?" And the answer was "Yes" in that case."**

(Tech. Tut. Tr. at 43:9–21) (emphasis added). *See also id.* at 43:4–6 (Dr. Winters notes that semiconductor devices "include diodes, transistors, amplifiers, memory, microprocessors, **micro-controllers**, as well as computers.") (emphasis added). Indeed, Dr. Conrad similarly notes that "both microprocessors and microcontrollers that include microprocessors are both semiconductor devices," although he contends that the '043 patent only referred to microprocessors. (Dkt. No. 192 ("Conrad Declaration"), Ex. B ¶ 110). This flies in the face of Dr. Winters' previous testimony that "the '043 patent does not depart from the well-understood use of a smart card semiconductor device." (Dkt. ¶ No. 23 37).

While T–Mobile stretches OTI's use of the term "microprocessor" to somehow be exclusive of other kinds of semiconductor devices, the Court is once again cognizant of Dr. Winter's testimony that semiconductor devices are "commonly known as a microprocessor." (*Id.* ¶ 38). Accordingly, the Court does not find that OTI has broadened its definition of semiconductor device, but rather concludes that both parties initially agreed to give that term its usual, broad definition.

Similarly, the Court finds no need to construe the term "fixedly connected." T–Mobile insists this term implies the absence of a switching element in the entirety of the device. (T–Mobile Mem. 5). But the claim clearly states that the contacts are "fixedly connected to the semiconductor device during both said contact and contactless models." (Haber Deck, Ex. 1 at 13:44–46). Accordingly, as already explained during claim construction, the patent's limitation is circumscribed to the area between the contacts and the semi-

conductor device—nowhere else. (*See* Claim Constr. Or. 23).

In sum, the Court agrees with OTI that no further claim construction is required at this late juncture in the case. The Court now turns to the actual merits of T–Mobile's summary judgment motion for non-infringement and patent invalidity.

### ii. The STMicroelectronics Semiconductor Device Is Within the Scope of the '043 Patent

T–Mobile contends both that the NFC phones at issue do not infringe on the '043 patent and, additionally, that the '043 patent is invalid. This section addresses, and ultimately rejects, T–Mobile's various arguments in support of the first contention.

T–Mobile's first argument that the NFC phones did not infringe on the '043 patent is that the NFC phones fall outside the scope of the patent because they use microcontrollers, which are a kind of semiconductor device including a switching element and microprocessor. This argument requires little discussion in light of the foregoing analysis.

T–Mobile argues that the ISIS hardware cannot infringe because it uses a STMicroelectronics microcontroller, a kind of semiconductor device. As T–Mobile explains, these semiconductor devices contain, *inter alia*, a computer processing unit ("CPU"), a kind of microprocessor (Flaber Deck, Ex. 18 at 32:15–18), and an internal bus (*Id.*, Ex. 22). The internal bus in the device is produced by ARM Holdings, plc ("ARM"), which in its publicly available specifications clarifies that the bus is a form of multiplexor (*Id.* at 3), which all parties agree is a kind of switching element. (Conrad Rebuttal Rep. ¶¶ 139–142; Flaber Decl., Ex. 17 at 108:13–16). T–Mobile concludes that that no infringement has occurred because the existence of a multiplexor *within* the semiconductor device and along the data path for all data—contact and contactless—travelling to the microprocessor (*also* inside the semiconductor device) from the contacts (i.e. the contact field and antenna coil), is inconsistent with a device that distinguished prior art by eliminating the use of switching elements. All OTI has done, T–Mobile insists, is move the switching element from being outside the semiconductor device, as in the Kreft '495 patent, and wedged it inside of the semiconductor device.

Regardless of whether OTI has simply shifted the switching element inside the semiconductor device, this argument is wrong. As the Court made clear in its claim construction order, the '043 patent "obviates the need to use a switching device ... to connect the microprocessor with both the contact and contactless sources of data. The use of separate, dedicated connections between the microprocessor and the data entry points allows the microprocessor to (1) use different protocols for communicating through contact and contactless mode and (2) alter its protocol capabilities through software updates rather than hardware retooling." (Claim Constr. Or. 3). The Court did not state that the '043 patent precludes any use of a switching element. Similarly, OTI has *never* explicitly disclaimed the use of a switching element in the '043 patent in *any* capacity. The plain text of the '043 patent refers to the removal of the switching element from the data path *between* the semiconductor device and the contacts.

In light of this, T–Mobile's first argument fails. Regardless of whether it is termed a microprocessor or a microcontroller, the STMicroelectronics ST33F1M is semiconductor device containing an internal bus or multiplexor. However, because OTI did not disclaim semiconductor devices which themselves contained a switching element, the presence of such an element in the accused products does not remove them from the scope of the '043 patent.

### iii. Anticipation of the '043 Patent

 T–Mobile next moves to invalidate the '043 patent on the theory that it was anticipated by prior art, specifically the Kreft '495 patent. Under 35 U.S.C. § 102 a claim is anticipated "if each and every limitation is found either expressly or inherently in a single prior art reference." *King Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1274 (Fed.Cir.2010) (citing *Celeritas Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360 (Fed.Cir. 1998)). However, it is the burden of a patent challenger to demonstrate invalidity by clear and convincing evidence. *See Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1372 (Fed.Cir.2005) (citing 35 U.S.C. § 282). *See also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S.Ct. 2238, 2240, 180 L.Ed.2d 131 (2011) (holding that patent invalidity defense under 35 U.S.C. § 282 must be "proved by clear and convincing evidence."). Furthermore, the prior art must "not only disclose all of the elements of the claim within the four corners of the document, but ... also disclose those elements arranged as in the claim." *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1351 (Fed.Cir.2013) *cert. denied sub nom. Cheese & Whey Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, —— U.S. ——, 134 S.Ct. 1542, 188 L.Ed.2d 557 (2014).

T–Mobile begins by explaining that Kreft '495 displays a semiconductor device including an internal switching element and a microprocessor. Figure 2 from the Kreft '495 patent, shown below, illustrates this.

Accordingly, it argues in the alternative that *if* the '043 patent can be read to describe a semiconductor device with an internal switching element and microprocessor, then the '043 patent is anticipated by Kreft '495, which possesses a similar semiconductor device. The image below, taken from T–Mobile's brief, shows on the left the STMicroelectronics semiconductor device that OTI alleges to be part of the infringing system in the NFC phones at issue.

T–Mobile takes the position that the ARM internal bus from the STMicroelectronics semiconductor device used in the NFC phones is the equivalent of switching element 2.1 in the Kreft '495 design and that the CPU unit stands in for microcomputer 2.2. OTI, however, takes the position that the PTO examiner approving Kreft '495 interpreted microcomputer 2.2 alone to be the semiconductor device, with switching element 2.1 operating externally to this semiconductor device.

Resolving this disagreement is complicated by ambiguity in the Kreft '495 patent itself. For instance, the Abstract to Kreft '495 explains that the device "includes a switching element device, preferably a multiplexer, coupled between a semiconductor device and contacts in a contact field and transmission coils." (Haber Decl., Ex. 4 at 1). Moreover, claim 1 of the patent claims "a semiconductor device; *and* a switching element device coupled to said contacts, and coils, and said semiconductor device operative to effect selective data transmission between said contacts or said coils and said semiconductor device." (*Id.* at 4:33–38). That language reinforces OTI's position that the switching element in the Kreft design was separate from the semiconductor device. However, in the Detailed Description of the Presently Pre-

ferred Embodiments portion of the patent, it describes a "semiconductor device 2 include[ing] suitable switching elements for selecting use of either the coils 4 and 5 or the contacts in the contact field 3 for data transmission." (*Id.* at 3). It further explains that "the semiconductor device 2 preferably comprises both a switching element device 2.1 and a microcomputer 2.2 with arithmetic unity and memory." (*Id.*) This language strongly favors T–Mobile's position, as it suggests the semiconductor device is inclusive of the switching element and the microprocessor, just as the STMicroelectronics semiconductor device includes a CPU and an internal bus.

The analysis is further complicated by the fact that both parties acknowledge that a microprocessor is independently a semiconductor device, and not merely a component of one. (Tech. Tut. Tr. At 4:19–20, 7:18–25; 43:4–6). T–Mobile's position is supported by Figure 2 from the Kreft '495 patent, which appears to envision a semiconductor device including both the microprocessor and the switching element. Additionally, while OTI takes the position that Dr. Winters, T–Mobile's initial expert, believed microprocessor 2.2 to constitute the semiconductor device, this is not the case. In his technology tutorial presentation, Dr. Winters explained that "the '043

patent incorrectly depicts the Kreft '495 patent" and took the position that "the semiconductor device, 2, includes both 2.1, the switching device, as well as 2.2, the microcomputer." (Tech. Tut. Tr. at 52:6–12). Moreover, in her testimony, Dr. Apsel acknowledged that Kreft '495 appeared to describe two semiconductor devices. (*See, e.g.,* Haber Decl., Ex. 18 at 34:11–20; Ex. 7 ¶ 47). Dr. Conrad also acknowledged that Kreft described multiple embodiments of the semiconductor device. (Conrad Decl., Ex. B ¶ 95).[13]

■ This ambiguity is a question of law that falls within the domain of the Court. *See Function Media, L.L.C. v. Google, Inc.,* 708 F.3d 1310, 1326 (Fed.Cir. 2013) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1360 (Fed.Cir.2008) ("determining the meaning and scope of the patent claims" is a question that "the court, not the jury, must resolve"). The Court concludes that the weight of intrinsic evidence favors T–Mobile's reading of the Kreft '495 patent. All three figures associated with the Kreft '495 patent reveal a single chip 2, which, as clarified by Figure 2, internally includes a switching element 2.1 and a microcomputer 2.2. (Haber Decl., Ex. 4 at 1–2). The Abstract language that the device "includes a switching element device, preferably a multiplexer, coupled between a semiconductor device and contacts in a contact field and transmission coils," does not conclusively prove that the microcomputer 2.2 is the operative semiconductor device simply because it is referred to as a "semiconductor device." Rather, this language reflects the fact that "semiconductor device" is a broad term inclusive of numerous components, as Drs. Winter and Apsel

established during the technology tutorial. As other portions of the Kreft '495 patent show, the entirety of chip 2 is also referred to as a semiconductor device. (*Id.* at 2:65). More importantly, the preferred embodiment claimed by Kreft discloses a "semiconductor device 2" comprised of "both a switching element device 2.1 and a microcomputer 2.2." (*Id.* at 3:12–14). "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.,* 474 F.3d 1323, 1333 (Fed.Cir.2007) (citing *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH,* 386 F.3d 1133, 1138 (Fed. Cir.2004)). Accordingly, the Court concludes that both the Kreft '495 patent and the '043 describes a semiconductor device with an internal switching element.

■ However, a material dispute of fact remains as to other key elements of the anticipation claims. Specifically, the parties disagree as to what constitutes the "antenna interface" of the Kreft '495 patent. Analyzing the image below, Figure 3 of the Kreft patent (a more detailed version of Figure 2), OTI contends that entities 2.1.1 and 2.1.4, the rectifier and converter respectively, constitute the entirety of the "antenna interface." All six lines leading out from the contact field 3 connect to the unlabeled box, which represents the switching element (a multiplexor). Line 16 also connects to 2.1.2, the comparator. Accordingly, Dr. Apsel explains, they are not "coupled" to "at least some" of the contacts in the contact field. (Haber Decl., Ex. 753) ("Apsel Rebuttal Report"). Rather, they only connect to the switching element, which is comprised

---

13. It is important to note that this ambiguity does not require the Court to construe the term 'semiconductor device.' The question here is not whether either the STMicroelectronics semiconductor device or its internal

microprocessor can be deemed a semiconductor devices. Rather, it is which device did the Kreft '495 patent identify as the semiconductor device for purposes of the patent's scope.

of the multiplexer and the comparator 2.1.2 which, according to Dr. Apsel, "has the sole purpose of controlling the multiplexer." (*Id.* ¶ 59). The proposition that comparator 2.1.2 is part of the switching element, rather than the antenna interface, finds support in the text of the patent, which explains that "[t]he switching element 2.1 further *includes* a comparator 2.1.2" (emphasis added) and also that "[t]he comparator 2.1.2 produces an output signal at output E3, which output signal is supplied to a multiplexing unit 2.1.3." (Haber Decl., Ex. 4 at 3).

## FIG. 3

Conversely, Dr. Conrad reads the antenna interface to include the comparator 2.1.2, which would provide a direct link to contact line 16. Dr. Conrad repeatedly states that the comparator is part of the antenna interface (*see, e.g.,* Conrad Decl., Ex. B 95, 169, 172, 179, 181). In their motion for summary judgment, T–Mobile states that Dr. Apsel and Dr. Conrad are in agreement that the antenna interface is contained within element 2.1 of Kreft's Figure 2. (T–Mobile Mem. 21). Their analysis then proceeds from the assumption that Dr. Apsel included comparator 2.1.2 and the multiplexer as part of the antenna interface, but this is plainly not the case. (Apsel Rebuttal Rep. ¶ 59). Perhaps sensing this, T–Mobile alternatively takes the position that, because OTI interpreted the terms "contact field" and "galvanic connection" broadly, the antenna interface is in fact connected to all of the

contacts, including the antenna coil 4 and 5. This inchoate argument neglects the fact that the Court's *Markman* order interpreted the term "contact field" as a "*particular subset* of galvanic connections allowing data transmission between the contacts and the semiconductor device *in accordance with the contact data communications protocol*" (Claim Constr. Or. 13) (emphasis added). Accordingly, connections not capable of allowing data transmission in accordance with the ISO 7816 contact data protocol are not relevant for purposes of assessing this element of claim 1. Thus, T–Mobile's argument that the antenna interface's connection to antenna coils 4 and 5 should count for purposes of demonstrating anticipation of this element of claim 1 must fail. Those contacts *do not* facilitate data transmission between the coils and the semiconductor device *in accordance with the contact data communications protocol* because the antenna coils cannot communicate via the contact data protocol. (Haber Decl., Ex. 4 at 4:9–15). This incontrovertible fact is reinforced by the plain text of the '043 patent, which emphasizes that the antenna interface must be connected to the antenna coil *and* at least some contacts in the contact field. This would be highly redundant if the antenna coil connection could be included as constituting "contacts in the contact field."

 "Anticipation is ultimately a question of fact, but also depends on proper claim construction—a legal issue." *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1287 (Fed.Cir.2005). Determining whether the Kreft '495 patent described a semiconductor device including an internal switching element was a legal question concerning the scope of that patent. Conversely, whether the Kreft '495 discloses an antenna interface coupled with some contacts in the contact field is a question regarding "whether or not an element [of the allegedly anticipated pat-

ent] is inherent in the prior art." *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed.Cir.1999). This is a question of fact. *Id. See also In re Johannes*, 566 Fed.Appx. 923, 925 (Fed.Cir.2014) ("Anticipation is a question of fact, as is the subsidiary question of whether a prior art reference discloses—either expressly or inherently—a claim limitation."). Because T–Mobile's proffered evidence does not adequately demonstrate that the antenna interface is coupled with some contacts in the contact field, summary judgment is inappropriate on the question of anticipation. *See Sanofi–Aventis v. Sun Pharm. Indus., Ltd.*, 08–cv–6286 (SHS), 2011 WL 1899789, at 2 (S.D.N.Y. May 11, 2011).

#### iv. Dr. Apsel's Testimony Raises a Genuine Issue for Trial

T–Mobile's argument that Dr. Apsel's opinions fail to create a genuine issue for trial is simply a highly abridged repackaging of their motion to strike her testimony. Moreover, as explained, her testimony raises genuine issues of dispute regarding the connections of the antenna interface. Accordingly, this argument is rejected.

#### v. Summary

For the reasons above, T–Mobile's motion for summary judgment on the issues of infringement and patent invalidity is DENIED. T–Mobile may, however, demonstrate the invalidity of the '043 patent at trial.

### 3. OTI's Motion for Summary Judgment on Infringement

 OTI now moves for summary judgment on the question of whether T–Mobile's NFC phones infringe on claims 1 and 2 of the '043 patent. For the reasons below, OTI's motion is GRANTED.

#### i. The NFC Phones Infringe on Claim 1 of the '043 Patent

Claim 1 of the '043 patent describes a:

- "data transaction card having contact and contactless modes of operation, comprising:
- (a) a semiconductor device for operating in said contact and contactless modes in accordance with a respective contact or contactless data communications protocol;
- (b) a contact field (i) including contacts fixedly connected to the semiconductor device during both said contact and contactless modes, and (ii) allowing data transmission between the contacts and the semiconductor device in accordance with said contact data communications protocol only during said contact mode,
- (c) an antenna coil for allowing contactless data transmission between the antenna coil and the semiconductor device, in accordance with said contactless data communications protocol, and
- (d) an antenna interface (i) coupled (A) to the antenna coil, (B) to the semiconductor device and (C) to at least some of the contacts in the contact field and (ii) being responsive to an electromagnetic field across the coil for effecting said contactless data transmission."

(Yonay Decl., Ex. 1 at 13:39–58).

A review of the undisputed facts leads to the conclusion that OTI has demonstrated that the NFC phones, when used in conjunction with the SIM card distributed by T–Mobile, form a system infringing upon the one described in the '043 patent. As to the first element,[14] there is no dispute that the first SIM card that T–Mobile distributed to ISIS subscribers was the Gemalto UpTeq Mobile NFC Card. (*Id.*, Exs. 36–37). Indeed, this was acknowl-edged by Mr. Silis during his deposition testimony. (*Id.*, Ex. 3 at 71:12–13). According to Gemalto, this card includes a ST33F1M micro-controller produced by STMicroelectronics. (*Id.*, Ex. 40 at 11). The ST33F1M is a semiconductor device capable of communicating contact data with a host processor using ISO 7816 and contactless data with an NFC controller using the ETSITS 102 613 standard, also known as the Single Wire Protocol ("SWP"). (*Id.*, Ex. 41 at 1). Moreover, T–Mobile requires that its SIM cards be able to independently communicate both contact and contactless data in order to allow the phone to make calls while operating the NFC technology. (JVL Secure Element Requirements 16; T–Mobile PRD 5). Specifically, T–Mobile's requirements state that it "must be possible for the end user to receive voice or data communications" while performing an NFC transaction and that it "must be possible to perform an NFC transaction while in voice or data communication mode," (Yonay Decl., Ex. 33 at 5). Mr. Silis' testimony is confirmative. When asked whether the NFC phones were capable of making calls while working in NFC mode, he responded, "It works. Most of the time there's no interference, you know. Because we ask for that requirement and then the vendors work towards that. There's no interference. I've tested it." (*Id.*, Ex. 3 at 91:14–17). There is no countervailing evidence in the record. Accordingly, OTI has established that there is no dispute that the NFC phones contain a semiconductor device, operating in contact and contactless mode, in accordance with respective contact and contactless data communications protocols.

---

14. The Federal Circuit has instructed that, generally, the preamble does not act as a limitation on a patent claim. See, e.g., *Am. Med. Sys., Inc. v. Biolitec, Inc.,* 618 F.3d 1354, 1358 (Fed.Cir.2010). The Court's Markman order concluded that the preamble did not act as a claim limitation in this case. (Claim Constr. Or. 9).

Next, regarding the second element, there is no dispute of material fact that the SIM cards have contacts fixedly connected to the semiconductor device and allowing data transmission between the contacts and the semiconductor device. Specifically, the SIM card has eight exposed contact pads (C1–C8). (*Id.,* Ex. 35 at ¶ 39; Ex. 4 at 1162). The image below, from Dr. Apsel's report, identifies these eight exposed contact pads. (Yonay Deck, Ex. 35 ¶ 39). One of these pads, C6, is used for communication with the NFC controller via the SWP protocol. (*Id.,* Ex. 3 at 64:5–13; 81:3–10) Another, C7, is used for communication with the host processor using the ISO 7816 protocol. (*Id.* 81:3–10).

OTI takes the position that each of these contacts is "fixedly connected" to input/output ports on the semiconductor device. (*Id.,* Ex. 5 at 137:13–138:23, 144:2–148:9; Ex. 35 at ¶ 39). The input/output ports are separate, with one dedicated for contactless data (the SWP input/output port) and one dedicated to contact data (the ISO 7816 input/output port). (*Id.,* Ex. 41 at 1). Because the data exchanged between the contact field and the input/output port dedicated to contact data is communicated via ISO 7816, a contact data communications protocol, OTI contends the second condition of this element is met. (*Id.,* Ex. 5 at 147:4–148:9). T–Mobile's primary opposition to this is to again rely on Dr. Conrad's opinion that the contacts are not 'fixedly' connected to the semiconductor device because they pass through the internal bus before communicating with the CPU within the ST33F1M. (*Id.,* Ex. 6 ¶ 145) ("Conrad Report"). But the Court does not accept, as a matter of law, the premise that the CPU within the ST33F1M semiconductor device is the semiconductor device described by the '043 patent. *See supra* Section III.B.1.ii.

T–Mobile also argues that contactless data travels via C7, meaning that the design does not allow for "data transmission between the contacts and the semiconductor device in accordance with said contact data communications protocol only during said contact mode." Specifically, Dr. Conrad contends that "Contact C7 is used to transmit data that has been exchanged in a contactless mode." (Conrad Report ¶ 172). Dr. Conrad describes a security process through which the user of the cellphone device is authenticated by having a MNO cell tower communicate with the SIM card. (*Id.* ¶ 173). The SIM card contains an authentication key that is communicated back to the tower in order to confirm the user's identity. (*Id.*). Dr. Conrad further

explains that this process is facilitated through a RF radio transmission, a form of contactless data transmission, from the cell tower to the user's phone and, critically, that the "data that results from this contactless authentication of the phone" is transmitted via the C7 contact on the SIM card. (*Id.*). Accordingly, the C7 contact must transmit some data that is contactless, contrary to Dr. Apsel and OTI's position that "the only data carried on C7 is the contact mode data from the host processor to the UICC microprocessor." (Yonay Decl., Ex. 35 58).

But Dr. Conrad's explanation does not stand for the proposition T–Mobile suggests. Dr. Conrad explains that the C7 contact only transmits the "data that results" from the contactless authentication of the phone, *not* data operating via a contactless protocol itself. Indeed, nowhere in his analysis does he contend that the cell tower data traveling from the phone's host processor to the SIM card is transmitted via anything other than the ISO 7816 contact data protocol, as described in the '043 patent. It is simply not relevant that the data traveling between the contacts and the semiconductor device was, once upon a time, transmitted via a contactless data protocol. The patent only calls for it to be communicated via a contact data protocol while being transmitted "between the contacts and the semiconductor device."

Claim 1's third element is that the device include "an antenna coil for allowing contactless data transmission between the antenna coil and the semiconductor device, in accordance with said contactless data communications protocol." (*Id.*, Ex. 1 at 13:51–55). The '043 patent describes a two-step process by which contactless data is transmitted between the antenna coil and the semiconductor device. This involves an over-the-air segment and a wired segment. First, the antenna coil on the phone receives data as an RF signal, possibly, in the ISO 14443 protocol, from a contactless reader. After that, the data is converted by the antenna interface from its original state as an RF signal and into a digital signal, which is communicated to the semiconductor device via a wired path. (*Id.*, Ex. 11 ¶¶ 57–59; Conrad Report ¶ 72). This wired path can be seen on Figure 3 of the '043 patent, which shows the antenna interface 16 linked to the microprocessor via, *inter alia,* connection 17. This connection "allows for connection of the antenna interface 16, via the line 17, to the second i/o port IO2 of the microprocessor 14 (constituting a contactless i/o port thereof in parallel with the contact C4 of the contact field 11." (*Id.*, Ex. 1 at 4:61–65).

Fig. 3

There is no reasonable factual dispute that T–Mobile's required method of transmitting contactless data from the antenna to the SIM Card infringes on the '043 patent. Per T–Mobile's PRD, all NFC phones must have a built-in NFC antenna coil allowing for NFC communication. (T–Mobile PRD 8). Mr. Silis similarly agreed that "All NFC capable phones have a proximity antenna." (Yonay Decl., Ex. 3 at 57:12–13). Dr. Conrad acknowledges that data from the antenna coil is communicated to the secure element on the SIM card via the NFC controller (antenna interface)—the same path described by the '043 patent. (Conrad Report ¶ 72). Moreover, T–Mobile requires that the NFC phones communicate this data from the antenna coil to the semiconductor through the *same* multi-step process described by the '043 patent. First, the data is communicated wirelessly from a contactless reader to the NFC controller via the antenna coil using the ISO 14443 standard, a kind of RF signal. (Conrad Report ¶ 72). This is *required*. (Yonay Decl., Ex. 33 at 8). Next, the data is communicated from the NFC controller (antenna interface) to the semiconductor device. (Conrad Report 72). [redacted text] (T–Mobile

PRD 7). Summed, T–Mobile requires that participating NFC phones contain an antenna coil that can communicate contactless data to the semiconductor.

T–Mobile contends that the Single Wire Protocol, because of its physical connection between the secure element and the antenna interface, is a contact data communications protocol and that accordingly the third claim provision is not met. (T–Mobile Opp. 25; Conrad Decl., Ex. D ¶¶ 166–69). This misreads, as a matter of law, the plain language of the '043 patent and additionally the ISIS specifications language, both of which similarly envision part of the "contactless" data line containing a physical component. For instance, the ISIS Architecture document describes "two links between the mobile device and each [secure element]" a contact link and a "contactless link, allowing the [secure element] to establish a connection to a contactless reader, through the NFC controller and the antenna." (ISIS Architecture 14). Critically, it then states *"[e]ven though these two links may in some cases be implemented on the same physical link, it is important to distinguish between them . . ."(Id.).*

In other words, it is undisputed that the ISIS Architecture recognizes that the process of transmitting contactless data from the antenna, via the antenna interface, to the semiconductor, can incorporate a "physical link." This is entirely consistent with the '043 patent's description of a device wherein the "contactless i/o port of the semiconductor device is coupled to a data /i/o port of the antenna interface for effecting said contactless data transmission." (Yonay Deck, Ex. 1 at 15:12–14; *see also id.* Fig. 2, Fig. 3). [redacted text] Accordingly, T–Mobile's argument that the Single Wire Protocol uses a contact data communications protocol by virtue of its physical component is baseless. There is no genuine dispute that both the '043 patent and the ISIS specification documents, precludes the use of a physical, wired component of the contactless data path.[15]

The final element for claim 1 of the '043 patent concerns the antenna interface;[16] namely that it is (1) coupled to the antenna

**15.** T-Mobile similarly grasps at straws where it alleges that the NFC phones are removed from the scope of the '043 patent due to the need to convert contactless data received by the antenna as an RF signal before transmitting it via the Single Wire Protocol to the secure element. (T-Mobile Opp. 25). T-Mobile contends that Dr. Apsel's testimony explicitly disavowed the use of such a conversion under the '043 patent. But this is simply wrong. Dr. Apsel explained that there were benefits to exchanging data on separate interfaces of the microprocessor for contact mode data and contactless mode data. (Apsel Rep. = 46). Dr. Apsel described the Kreft '495 patent as exchanging both forms of data via the same communications protocol on the same interface. Accordingly, conversion of the contactless data only contradicts Dr. Apsel's testimony to the extent it is converted into the same contact protocol used in contact mode and is sent to the secure element via the same interface. But this is not the case in the NFC phones. Rather, here, the contactless information enters the secure element via a dedicated interface (the C6 SWI/O port) and via the Single Wire Protocol, while contact data enters the secure element via a different interface (the C7 ISO 7816 port) and via the ISO 7816 protocol. There is no material dispute as to these facts and they are entirely consistent with the '043 patent.

**16.** The phones use one of three NFC controller chips: the NXP PN544 or PN65N or the Broadcom 2097 (Silis Dep. at 62: 10-22)). While Dr. Apsel only discussed the PN544, her report explained that the PN65N itself includes a PN544 chip. (Yonay Deel., Ex. 49 at 45). Indeed, the manufacturer of these NFC controllers stated that the PN65N 'combines the well-known PN544 controller with a secure element.') T-Mobile challenges this assertion and argues that that the T-Mobile witness actually testified that he does not know whether the phones contain the PN544 chip, but this is not the case. (T-Mobile Opp. 4-5). In response to the question, 'Which [phones] use an NXP chip?' Mr. Silis responded 'Samsung GS2, GS 3, Relay 4G, Note II, HTC One.' (Yonay Deel., Ex. 3, 63:3-4). After acknowledging that the Samsung Galaxy S4

coil, the semi-conductor device, and at least some of the contacts in the contact field and (2) that it be responsive to an electromagnetic field across the coil for effecting contactless data transmission. There is no dispute that T–Mobile's required specifications result in the antenna interface being coupled to the antenna coil (T–Mobile PRD 8), the semiconductor de-

vice (Yonay Decl., Ex. 48 at 12), and at least two contacts (Yonay Decl., Ex. 48 at 11–12), thus satisfying the first half of this element.

The image below, taken from the ETSI TS 102 613 standard (*Id.* at 11) ("ETSI TS 102 613 Tech. Specifications"), demonstrates this configuration.

The NFC controller, or antenna interface (labelled CLF here), is plainly coupled to the antenna coil. The ETSI TS 102 613 standard then requires that the antenna interface be connected to the semiconductor device on the SIM card. Specifically, it states that the "SWIO [Single Wire Input/Output] of the UICC [SIM Card] shall be used for data exchange between the UICC and the CLF [antenna interface]." (*Id.* at 12). Thus, the semiconductor device on the SIM Card is coupled to the antenna interface. Finally, the ETSI TS 102 613 standard requires that the "Vcc [Contact pad C1 on the SIM card] and Ground [Contact pad C5 on the SIM card] provided in the UICC [SIM card] shall be

reused by the terminal to provide supply power." (*Id.*). These two contacts communicate data in accordance with the ISO 7816 protocol for contact data. (*Id.*). Accordingly, it is undisputed that the antenna interface is also coupled to "at least some" contacts in the "contact field," which this Court interpreted as including those contacts operating pursuant to ISO 7816. (Claim Constr. Or. 13–16) (interpreting contact field as "subset of galvanic connections allowing data transmission between the contacts and the semiconductor device in accordance with the contact data communications protocol.")

Turning to the second part of this element, ISIS requirements specify "the

---

used the Broadcom chip instead of the NXP, Mr. Silis was asked, 'But all the other ones you listed have an NXP chip?' He responded unambiguously, 'Yes.' (Id. at 63:8-9). Admittedly, Mr. Silis was not able to explain whether these phones using the NXP chips used either the PN544 or the PN65N chip, but that

is immaterial. As OTI explained, the PN65N chip itself *includes* at PN544 chip. (*Id.*, Ex. 49 at 45). The one phone using the Broadcom chip, the Galaxy S4, was not included as an infringing device in OTI's amended complaint.

NFC hardware SHALL be compliant with ISO–14443 standards ... for card emulation." (Yonay Decl., Ex. 26 at 43). Compliance with the ISO–14443 standards necessarily mean that the antenna interface is responsive across an electromagnetic field for effecting contactless data transmission. *(See generally id.,* Ex. 23). Moreover, Dr. Conrad's report acknowledges that the antenna interface is responsive to an electrometric field. (Conrad Report ¶ 179).

T–Mobile disputes this, however, on the theory that the antenna interface will only sense a signal across the antenna coil after "specific command from the processor in the phone, and only after verifying that a SWP UICC [SIM card] is installed." (Conrad Report ¶ 178). Additionally, Dr. Conrad explains that even this "requires that the device first have been activated for use with the ISIS mobile wallet—merely placing the SWP UICC [SIM card] into the phone, or even activating the SWP UICC for use with the phone, would not be sufficient." *(Id.)* Dr. Conrad's argument, in lay terms, is that the antenna interface is not responsive to the electromagnetic field when the device is turned off or before the phone user registers for the ISIS wallet. But this argument fails as a matter of law, as nothing in the plain text of the '043 patent describes a device that must *always* be responsive to the electromagnetic field, only that it possesses the technological ability *to be responsive.*

The case of *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.,* 501 F.3d 1307, 1312–13 (Fed.Cir.2007) is illustrative. In that case, the Federal Circuit overturned a jury verdict finding induced infringement because the only evidence demonstrating that the device could be used in an infringing manner was an expert's testimony that the "most natural and intuitive way to employ the device" required infringement. *Id.* at 1313. In rejecting this reasoning, the

Federal Circuit observed that "the parties do not dispute that the accused device can be operated in either two modes—the infringing method [described by the expert] or the noninfringing [ ] method. Because the accused device *can be used at any given time in a nonfringing manner,* the accused device does not necessary infringe the [ ] patent." *Id.* In other words, the inquiry is whether the device *can be operated* in a non-infringing manner, not whether it infringes *while not being operated* at all. T–Mobile's position turns this line of thinking on its head, proposing that a device does not infringe simply because a user may elect to never turn it on. Despite its argument to the contrary, taking a product out of the box and using it is not akin to "modifying" it. *See Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1330 (Fed.Cir.2001) ("that a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement.").

Accordingly, because the NFC phones' antenna interface, when operating in its intended and sole capacity, is responsive to an electromagnetic field across the coil for effecting contactless data transmission, there is no material dispute that the phones operate according to the fourth and final element of the '043 patent.

### ii. T–Mobile's Counter–Arguments Are Not Persuasive

Beyond the specific technical arguments raised about each claim element, T–Mobile raises several general objections. Primarily, it attempts to raise some scintilla of doubt by repeatedly emphasizing that Dr. Apsel did not analyze the circuity of the individually alleged products and that, even if it could be shown that all the accused products complied with T–Mobile's required standards, this would still not demonstrate that the products *necessarily*

infringe in all instances. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261, 106 S.Ct. 2505, 2516, 91 L.Ed.2d 202 (1986) (explaining that genuine dispute of fact at summary judgment stage requires more than "metaphysical doubt").

As explained, the Federal Circuit has made abundantly clear that standards may be used to demonstrate infringement so long as those standards are (1) required and (2) that all implementations of the standard result in infringement. *See Fujitsu*, 620 F.3d at 1327–28. To the extent a standard is optional, a patent owner may still use standards to demonstrate infringement so long as they can show that the infringing products actually employs the optional standard. *Id.* at 1328.[17] As explained in the foregoing analysis, OTI has demonstrated how T–Mobile's own requirements *necessarily* result in infringement of claim 1. T–Mobile blandly states that vendors may not ultimately comply with these requirements or that they may achieve interoperability without strict adherence to the requirements. (T–Mobile Opp. 7). But this is exactly the sort of vague metaphysical doubt insufficient to create a genuine dispute of fact. Rather, T–Mobile must "come forward with specific facts showing that there is a genuine issue for trial." *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir.2007). Notably, rather than point to any specific facts, such as instances where T–Mobile issued a waiver to a manufacturer who had

achieved interoperability without adherence to T–Mobile's own standards, the Defendant instead simply proposes speculative reasons as to why manufacturers may not have followed *mandatory* specifications. The core holding of *Fujitsu*, that standards may suffice to demonstrate infringement, would be thinned to the point of breaking if an alleged infringer could simply speculate as to ways in which standards were not met.[18]

T–Mobile's next argument is that OTI has failed to demonstrate that any accused NFC phone has actually been combined with a SIM card, or that anyone combining the two pieces of equipment actually subscribed to the ISIS Mobile Wallet. (T–Mobile Opp. 10). Instead, it alleges, OTI can only demonstrate that T–Mobile has offered to sell both the NFC phones and the SIM cards, which purchasers may then elect to combine and activate with ISIS. (*Id.*) In support, T–Mobile cites to *Cross Med. Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed.Cir. 2005), which rejected a medical device developer's claim that a competitor "need only make devices that are capable of being converted into infringing devices" in order to be a direct infringer. Similarly, T–Mobile cites *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed.Cir.2011) for the proposition that a Defendant is not directly liable for infringement when the "customer"

17. As frequently noted by T–Mobile, the Fujitsu court was quick to acknowledge that 'in many instances, an industry standard does not provide the level of specificity required to establish that practicing that standard would always result in infringement.' *Fujitsu*, 620 F.3d at 1327. That is not the case here, as OTI has demonstrated how T–Mobile's own requirements necessarily result in infringement.

18. To the extent T–Mobile is ultimately able to demonstrate that some of the products at issue, due to fluke or intentional design, do not

conform with T–Mobile's own proffered specifications, that may impact the determination of damages. But at this stage, T–Mobile's repudiation of its own required specifications, without pointing to any record evidence or actually disputed fact, is not enough to create a genuine issue for trial. See *Al–Site Corp. v. Opti–Ray, Inc.*, 91–cv–1770, 1992 WL 209330, at *2 (E.D.N.Y. May 26, 1992) ('[A] court in a patent action may grant summary judgment on the question of infringement yet reserve other issues—such as validity of the patent or damages—for trial.')

rather than the Defendant "completes the system." But these two cases, and the others cited by T–Mobile, are inapposite to the present circumstances.

In *Qwest,* the customer was responsible for "making" the infringing product because they "complete[d] the system by providing the personal computer data processing means and installing the client software." *Id.* In other words, Qwest did not "combine all of the claim elements," *id.* at 1288, because an essential part of the patent at issue, a system which "collect[ed], *process[ed],* and deliver[ed] information from a service provider," *id.* at 1281 (emphasis added), was separately provided by the customer. That is not the case here, where T-Mobile provides all the components necessary to infringe upon each element of claim 1. Similarly, in *Medtronic,* there was a "genuine issue of material fact as to whether there are substantial non-infringing uses of Medtronic's devices." *Medtronic,* 424 F.3d at 1314. No such question exists here. T-Mobile's appeal to the term "combination" is misleading. As *Qwest* in particular makes clear, combination in this context means taking some components comprising elements of the claim and combining them independently with other components to create an infringing product. Under that scenario, the supplier of one portion of the claim elements is not a direct infringer because someone else "make[s] the patented invention." *Qwest,* 631 F.3d at 1279. Specifically, in *Qwest,* the consumer provided the processor device necessary for infringement to occur.

In a recent case, the Southern District of California persuasively distinguished both *Qwest* and *Medtronic* based on facts highly analogous to the case at bar. Judge Sammartino held:

> A common thread that runs through *Cross Medical* and *Centillion Data* distinguishes the relevant limitations from those at issue here. Specifically, in each of those cases, the patents-in-suit contained structural limitations requiring installation of the claimed devices on structures extrinsic to the devices themselves. That is, the accused device in *Cross Medical* could not contain every limitation of the claimed surgical implant until a surgeon implanted it, thereby placing the interface in contact with bone, 424 F.3d at 1311–12, and the accused billing system in *Centillion Data* did not contain every limitation of the claimed system until a customer installed it, thereby providing a "personal computer data processing means," 631 F.3d at 1288. Thus, in each case, the accused infringer sold a device that—on its own—did not infringe. Infringement could occur only if the accused infringer's customer installed the device on another structure. In contrast, the limitations at issue here—fresh and waste fluid tanks "in said housing"—merely require the customer to assemble parts of one good sold by ITW (or two separate goods, both sold by ITW, see infra) into a single structure.

*EBS Auto. Servs. v. Illinois Tool Works, Inc.,* 09–cv–996 (JLS)(MDD), 2011 WL 4021323, at *6 (S.D.Cal. Sept. 12, 2011) (emphasis added). Just like in *EBS Auto. Servs.,* the technology sold by T–Mobile "merely require[s] the customer to assemble parts" sold by T–Mobile into a single structure. Accordingly, a consumer of the ISIS Mobile Wallet does not "make" the product by simply snapping two of T–Mobile's products together.

Next, T–Mobile argues that OTI has failed to apply the Court's claim constructions, but as earlier noted, this is not the case. Similarly, the Court need not address again T–Mobile's arguments concerning the definition of the terms "fixedly connected" and "semiconductor device." (T–Mobile Opp. 12–17). As the Court has

already explained, OTI's definition of these terms has been consistent and T–Mobile cannot now attempt to relitigate claim construction, particularly regarding terms for which the parties originally held shared interpretations. *See supra* Section III. B.1.i.

### iii. The NFC Phones Infringe Claim 2 of the '043 Patent

Although it devotes the majority of their attention to Claim 1, OTI also moves for summary judgment on the question of whether T–Mobile infringes on Claim 2 of the '043 patent. Claim 2 of the '043 patent is that "the semiconductor device has separate contact and contactless i/o ports for effecting data transmission in accordance with said contact and contactless data communications protocol, respectively." (Yonay Deck, Ex. 1 at 13:59–63). Although this sounds derivative of Claim 1, it is a similar, but not identical. Furthermore, it does not act as an additional limitation to Claim 1. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC,* 713 F.3d 1090, 1097 (Fed. Cir.2013) (explaining that a rebuttable presumption exists that an independent claim should not be read to include a limitation imposed by a dependent claim).

Nonetheless, the analysis of Claim 1 above is effectively inclusive of this claim. The Gemalto SIM card at issue has a data contact, C7, that is connected to a dedicated input-output port and communicates with the STMicroelectronics semiconductor device via ISO 7816, a contact data communications protocol. (Yonay Decl., Ex. 5 at 147:4–148:9; Ex. 41 at 1). The SIM card has another data contact, C6, that is connected to a dedicated input-output port and communicates to the semiconductor device via a protocol capable of communicating contactless data. (Silis Dep. at 56:10–11; T–Mobile PRD at 5.1.14–20). Accordingly, there is dispute of material fact that the NFC phones possesses a semiconductor device having separate contact and contactless i/o ports for effecting data transmission in accordance with said contact and contactless data communications, respectively. The NFC phones thus infringe on Claim 2 of the '043 patent.

### iv. Summary

OTI has demonstrated that there is no genuine dispute of material fact regarding the operation of the NFC phones when used in conjunction with the Gemalto SIM Card. Moreover, using T–Mobile and ISIS' own required specifications, OTI has established that the NFC phones, when used with the SIM cards, infringe on claims 1 and 2 of the '043 patent. T–Mobile has only raised "metaphysical doubt" regarding the operation of the accused products. To the extent T-Mobile is able to demonstrate any of the accused products do not operate according to its own mandatory standards, that may affect any computation of damages. *See Fujitsu Ltd.,* 620 F.3d at 1327. T–Mobile may also still prove that the '043 patent was anticipated by the Kreft patents because the Court concludes that disputes of material fact exist regarding this issue.

### C. OTI's Motion for Summary Judgment on T–Mobile's Fourth Through Ninth Affirmative Defenses

In its most recent answer and counterclaim, T–Mobile asserts nine affirmative defenses. (2/11/2014 Answer & Counterclaim ¶¶ 29–44). OTI now moves for summary judgment on T–Mobile's fourth through ninth affirmative defenses, including the defenses of laches, estoppel, acquiescence, patent misuse, and inequitable conduct. For the reasons below, the motion is GRANTED in its entirety.

### 1. Laches, Estoppel, and Acquiescence

T–Mobile provides no support for their defenses of laches, estoppel, and acquies-

cence, instead taking the position that they are moot due to "OTI's complete inability to show that its '043 patent claims cover any NFC phones" and the "inevitable non-infringement judgment" that must ensue. (T–Mobile Opp. 19–20). However, as just explained, OTI has in fact demonstrated that it is entitled to summary judgment on the question of infringement. T–Mobile asks that these defenses be "dismissed without prejudice to T–Mobile raising them in the future should OTI ever again attempt to assert that NFC phones infringe without using a SWP SIM card as the secure element." (*Id.* 21). In turn, OTI asks for them to be dismissed with prejudice. (OTI Reply 10).

Because T–Mobile has abandoned these affirmative defenses in the current pleadings, OTI is entitled to summary judgment. *See, e.g., Pike v. Nick's English Hut, Inc.*, 937 F.Supp.2d 956, 961 (S.D.Ind. 2013) (concluding a party had "abandoned the affirmative defenses it did not defend on summary judgment," thus "entitl[ing] [the opposing party] to summary judgment on those defenses."). However, the Court only grants summary judgment on these affirmative defenses as to those NFC phones operating in conjunction with SWP SIM cards, as those are the only alleged infringing devices at issue in the pending motions. Accordingly, T–Mobile remains free to re-raise these defenses in the event that OTI again alleges that the NFC phones, on their own, infringe upon the '043 patent.

### 2. Patent Misuse

 Patent misuse is an equitable defense to patent infringement.[19] *See U.S.*

*Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1184 (Fed.Cir.2005). The purpose of the defense is to "prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 704 (Fed.Cir.1992). The "key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed.Cir.1998).

 Courts have "identified certain specific practices as constituting *per se* patent misuse, including so called 'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed.Cir.1997) (internal citation removed). In such instances, the party asserting a patent misuse defense must "prove that the defendant has market power in the tying product." *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 46, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006). Although a patent holder is entitled to bring an infringement claim in order to enforce their rights, patent infringement suits based on bad faith allegations may constitute patent misuse. *See Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1558 (Fed.Cir.1995) (noting that the "bringing

---

**19.** The defense is derived statutorily from 35 U.S.C. § 271(d), which states in relevant part that '[n]o patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: ... (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.'

of a lawsuit to enforce legal rights does not of itself constitute violation of the antitrust laws or patent misuse" but rather that "there must be bad faith and improper purpose in bringing the suit, in implementation of an illegal restraint of trade").

As part of its affirmative defense to patent infringement, T–Mobile alleges that OTI has committed patent misuse by impermissibly "tying a license to the '043 patent to its unpatented and separate NFC products and services." (2/11/2014 Answer & Counterclaim ¶ 44). In particular, T–Mobile alleges that "it was important to OTI's business plans that T–Mobile sign a license to use the '043 patent *only* as part of a broader business agreement ..." (T–Mobile Opp. 5). As evidence of this arrangement, T–Mobile first points to a press release in which OTI's then-CEO, Oded Bashan, stated, "We believe in the strength and value of our intellectual property and have the resources to protect it ... We are also happy to provide innovative technology and partner with others in the industry to facilitate the growing future of contactless payments, data capture, loyalty programs, and more." (Dkt. No. 191 ("Second Haber Declaration"), Ex. 3 at 1). The same release quotes Mr. Bashan as saying "This lawsuit is another step in OTI's ongoing strategy to leverage its IP assets, following the recently announced technology license agreement with a multi-billion dollar corporation ..." (*Id.*).

T–Mobile then highlights Mr. Bashan's deposition testimony.[20] Specifically, he was asked whether he had a preference, as CEO, for OTI to enter into a broad business relationship with T–Mobile, with a licensing agreement for the '043 patent being only one component of that relationship. He responded affirmatively and detailed his preference for a more wide-rang-

ing deal. (*Id.,* Ex. 2 at 47:21–48:2). When asked if he ever reached a conclusion on what the dollar amount would be for the '043 patent as one component of that deal, he responded that he could not determine that in isolation. (*Id.* 48:3–7). T–Mobile's counsel then presented Mr. Bashan with a parade of hypothetical sums, asking if any of them would have been an appropriate fee to license the '043 patent alone, without reaching a broader business agreement. (*Id.* 59:13–61:10). These sums ranged from $1 million to $40 million. (*Id.*) Mr. Bashan stated that he "cannot answer such a question" and that he prefers to look for "a full settlement solution." (*Id.* 60:12–14). Additionally, he stated "I don't believe in one item. It never work good for the future. It is better for 20, 30, 40, 10, 5 million. It doesn't matter. If both companies sitting and finding the right solutions that fit both of them, I believe only it will work for the long and for the benefit of both company. That's it." (*Id.* 60:15–21). Mr. Bashan latter added, "You can increase it to 100 million. It will be the same answer." (*Id.* 61:9–10).

■ No reasonable jury could conclude on this evidence that OTI had engaged in patent misuse. T–Mobile's references to Mr. Bashan's quotes in the OTI press release fail to raise a material dispute for trial. Just as vague bits of corporate puffery are not actionable under the securities laws, the generic statements put forth in the OTI press release cannot reasonably be read as forcibly conditioning a license of the '043 patent on reaching a broader agreement with OTI. *Cf. Pollio v. MF Global, Ltd.,* 608 F.Supp.2d 564, 571 (S.D.N.Y.2009) (noting that generalized expressions and puffery do not give rise to liability under the securities laws). Mr.

---

**20.** It should be noted that Mr. Bashan is Israeli and speaks English as a second language. Accordingly, all grammatical errors in the quoted testimony above are as in the deposition transcript.

Bashan's vanilla statement concerning the scope of OTI's intellectual property portfolio, and the company's interest in pursuing partnerships, does not raise a dispute of fact as to whether OTI was seriously attempting to engage in tying. (Second Haber Decl., Ex. 3 at 1). Indeed, OTI has every right to pursue litigation in defense of its intellectual property. Because T–Mobile has presented no factual evidence of bad faith, there is no material dispute regarding whether or not OTI brought its claims in good faith. *See Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, 500 F.Supp.2d 1290, 1340 (D.Kan. 2007) (rejecting patent misuse defense where there was "nothing in the summary judgment record from which a rational trier of fact could find that Sprint has acted with bad faith or an improper purpose in bringing this infringement lawsuit."). *See also W.L. Gore & Associates, Inc. v. Carlisle Corp.*, 529 F.2d 614, 624 (3d Cir.1976) ("An effort by a patent holder to defend his valid patent monopoly by exercising the right which he has in common with all others to do business with whom he pleases cannot rationally be regarded as a misuse of his patent.").

Similarly, a reasonable jury could only read Mr. Bashan's statements concerning the value of a license for the '043 patent without a broader agreement with T–Mobile to suggest that, at the outset of the negotiation process, he possessed an unarticulated desire for a broad-based agreement that would serve each company's needs. A reasonable jury, upon hearing Mr. Bashan's response that he would give the "same answer" in response to an offer of $100 million for a license to the '043 patent, could only conclude that such a remark was rhetorical, rather than being an actual refusal by OTI to accept such a sum. (Second Haber Decl., Ex. 2 at 50:12–23). When asked directly if he would have turned down $20 million for just a license to the '043 patent, Mr. Bashan responded,

"I cannot answer such a question. I thought before I am looking on a full settlement solution. I don't believe on one item. It never work good for the future." (*Id.* 60:12–16). That statement, reflective only of Mr. Bashan's own mindset at the beginning of talks between OTI and T–Mobile, does not create a triable issue regarding whether OTI sought to engage in tying. Indeed, T–Mobile has not presented any precedent, nor is the Court aware of any, suggesting that simply having an interest in a comprehensive settlement agreement constitutes evidence of patent misuse or bad faith. Moreover, T–Mobile has pointed to no evidence on the record suggesting that it was even *aware* of Mr. Bashan's mindset at the time of negotiation, which further reinforces that there is dispute of material fact regarding the alleged patent misuse.

■■■ T–Mobile also attempts to make hay out of the fact that OTI's original complaint specified "NFC phones" as the infringing products, but that it later amended its complaint to only include NFC phones used in combination with SIM cards. (T–Mobile Opp. 5–6). But T–Mobile fails to explain how OTI's *narrowing* the scope of their complaint by limiting the class of allegedly infringing products is evidence of patent abuse. T–Mobile has highlighted no record evidence to suggesting that OTI was deliberately overbroad in their initial pleadings or that their amendments were somehow an attempt to expand the scope of the patent. *See Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F.Supp.2d 885, 923 (D.Minn.2010) (concluding that although the defendant "discern[ed] a sinister motive in [plaintiff's] amendment of claims during the reexamination to cover the accused devices" there was "nothing improper in [plaintiff's] amendment of its claims"). *Cf. Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,

**404**

863 F.2d 867, 874 (Fed.Cir.1988) (concluding that it is not "in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application"). Accordingly, this theory also fails to raise a dispute of material fact concerning patent misuse.

Moreover, it is far from clear that T–Mobile is even able to assert a tying claim, given that negotiations remained inchoate. Many courts have concluded that mere offers cannot constitute patent misuse unless they are ultimately consummated. *See, e.g. Trading Technologies Int'l, Inc. v. eSpeed, Inc.,* No. 04 C 5312, 2008 WL 203385, at *1 (N.D.Ill. Jan. 18, 2008) ("While such a license, *if actually consummated,* could indeed constitute *per se* patent misuse, the fact that TT's offer was never more than that, an offer, negates that finding.") (emphasis added); *Virginia Panel Corp.,* 133 F.3d at 871 (concluding that an unconsummated offer could not constitute *per se* tying or patent misuse); *Applera Corp. v. MJ Research, Inc.,* 349 F.Supp.2d 321, 330–31 (D.Conn.2004) *on reconsideration,* 363 F.Supp.2d 270 (D.Conn.2005) (finding there was no patent misuse when the record only reflected ongoing negotiations).

But the Court need not ultimately reach that issue because of T–Mobile's failure to provide any supporting evidence from which a reasonable jury could determine that OTI engaged in patent misuse. Despite insisting that OTI attempted to engage in tying, T–Mobile has not even provided the contours of this putative tying arrangement, but rather relies primarily on Mr. Bashan's anodyne statements regarding his preferred form of settlement. Because T–Mobile has failed to even create a material dispute as to whether OTI actually attempted to engage in patent misuse, the Court does not need to reach

the question of whether OTI had sufficient market position to even dictate the terms of a tying agreement to T–Mobile. *See Trading Technologies Int'l, Inc.,* 2008 WL 203385, at *1 n. 2 (noting that the Court need not reach the question of market position where none of the conduct alleged amounted to an attempt to broaden the scope of a patent).

### 3. Inequitable Conduct

█ Like patent misuse, the defense of inequitable conduct is a judge-made canon that extends the doctrine of unclean hands to patent infringement cases. *See Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1285 (Fed.Cir.2011) (providing a history of the doctrine). "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Id.* at 1287 (citing *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1365 (Fed.Cir.2008)). The accused infringer must prove this by "clear and convincing evidence." *Id.* Importantly, in assessing materiality, the Federal Circuit has advised that the "materiality required to establish inequitable conduct is but-for materiality." *Id.* at 1292. Furthermore, only after the accused infringer has met this burden will the Court "weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." *Id.* at 1287.

T–Mobile presents several examples of what it considers to be intentionally misrepresented or omitted material information presented to the PTO. First, OTI allegedly withheld from the PTO that their only known mode for operating what would become the '043 patent was through the use of an off-the-shelf device featuring independent input/output ports and an internal switching element, namely a STMi-

croelectronics semiconductor device (T–Mobile Opp. 14). This omission was material because such separate input/output ports and the exclusion of such an internal switching element were the features that ostensibly differentiated the putative patent from prior art. *(Id.)* T–Mobile *once again* claims that the inventors' "primary intent when filing for the '043 patent was to attempt to distinguish the Kreft '495 patent based on the absence of a switching element shown in Kreft's semiconductor device." *(Id.* 15).

Second, T–Mobile alleges that subsequent to filing their patent application, OTI and the investors, through their attorneys and agents who interacted directly with the PTO, amended their claims to include arguments that were false, as now acknowledged by OTI employees. *(Id.* 16). T–Mobile contends that these falsehoods must have been material due to the fact that their application, initially rejected, was subsequently accepted by the PTO. *(Id.)*

T–Mobile's first allegation is quickly dispatched on a number of grounds. First, this theory of inequitable conduct appears *nowhere* in their answer and counterclaim. (*See generally* 2/11/2014 Answer & Counterclaim). This alone is a sufficient basis for dismissal. *See, e.g., Central Admixture Pharmacy Services, Inc.v. Advanced Cardiac Solutions, P.C.,* 482 F.3d 1347, 1357 (Fed.Cir.2007) ("pleading thus fails to provide the required particularity to *give notice to the other party of the facts on*

*which the defense is premised,* and it was properly dismissed by the district court.") (emphasis added); *Exergen Corp. v. Wal–Mart Stores, Inc.,* 575 F.3d 1312, 1328–29 (Fed.Cir.2009) (pleadings for inequitable conduct "must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO").[21]

Even as to the substance, T–Mobile's allegation of inequitable conduct fails to create a disputed question of material fact. Under T–Mobile's hypothesis, both prongs of the standard—materiality and intentionality—rest entirely on T–Mobile's incorrect theory regarding the role of the switching element in the '043 patent. Moreover, it is not even clear what T–Mobile considers to be deceptive about this conduct, as the '043 patent does not *claim* to have invented a new kind of semiconductor device or microprocessor. Accordingly, failing to inform the PTO that their novel *arrangement* used an off the shelf semiconductor device was not a material omission.

T–Mobile's second, or rather *original,* set of allegations are admittedly more substantial. It points to three specific statements in the amendment to the patent application that they contend are falsehoods:

---

**21.** A passage from *CSB–Sys. Int'l Inc. v. SAP Am., Inc.* is *particularly* on point:

'Indeed, Plaintiff filed a lengthy summary judgment motion on the original inequitable conduct theory, only to be casually met with a new theory argued for the first time in Defendant's Response to that Motion. Moreover, despite the fact that the perpetrating individual's state of mind is highly relevant to an inequitable conduct defense, neither party has deposed Mr. Haussingen. At this juncture,

fact and expert discovery is closed … and Plaintiff has no opportunity to pursue further discovery on the issue or file a new summary judgment motion. Clearly, the invocation of a new inequitable conduct theory at this time will not only be prejudicial to Plaintiff, but will require the expenditure of additional judicial resources. Accordingly, the Court is inclined to grant the Motion to Strike.' 10–cv–2156, 2012 WL 1645582, at *7 (E.D.Pa. May 10, 2012).

- "However, the contacts perform on a selective basis, that is, only in the contact mode"
- "Rather the presence of an electromagnetic field on the antenna coil automatically enables contactless operation of the smart card and, by the same token, disables the contact field—even though, in the invention, the contact field remains fixedly connected to the semiconductor chip"
- "In the case that only a single input is provided to the semiconductor chip, this requires that the semiconductor chip be programmed to operate under different communication protocols (i.e. ISO 7816 for contact data transfer and ISO 14443 for contactless data transfer); and that the correct protocol be employed depending on which interface is required"

(2/11/2014 Answer & Counterclaim ¶¶ 74–77; Shuman Decl., Ex. C at 2–4)

In his deposition testimony, Nehemya Itay, one of the inventors, acknowledged that these statements were technically incorrect. As to the first statement, Mr. Itay explained that it was a contradictory to other parts of the patent application. (Shuman Deck, Ex. F at 62:24–63:9; 65:3–11). Specifically, the contacts of '043 patent *do not* work on a selective basis. (*Id.* 67:24—68:18). Mr. Itay also opined that the second statement was technically incorrect, insofar as the electromagnetic field on the antenna coil *does not* disable the contact field. (*Id.* 79:14–24; Shuman Deck, Ex. G at 204:2–9). Mr. Italy also testified that that the third statement was incorrect. (Shuman Deck, Ex. G at 79:25–82:7). When asked by T–Mobile how these incorrect statements were included in the amended application to the PTO, Mr. Itay testified that he had no explanation (*Id.*, Ex. F at 66:18–24) and also that he did not have any involvement in the preparation of this amendment. (*Id.*

58:11–17). Similarly, he testified that he had no contact with the attorney in the United States (Mr. Itay is an Israeli citizen living in Israel) who submitted the amended application. (*Id.* 59:18–60:10). T–Mobile believes that Mr. Itay and his co-inventors were ultimately responsible for the submission, regardless of their involvement in drafting the amendment, because each named investor signed a sworn declaration, submitted to the PTO, which affirmed the accuracy of the submissions and their knowledge of its contents. (Second Haber Decl., Ex. 4).

 T–Mobile is ultimately not able create a dispute of material fact, however, because although these three statements were in fact false, they were also plainly not relevant in the examiner's decision to approve the '043 patent. The October 25, 1999 Notice of Allowability from the PTO for the '043 patent explicitly gave the reasons for the patent's approval upon reexamination. The sum total of this explanation was:

> The following is a statement of reasons for the indication of allowable subject matter: The prior art fails to disclose the claimed data transaction card comprising the contacts, the antenna interface, and *especially, the contact field which is fixedly connected to the semiconductor device during both contact and contactless modes.*

(Shuman Deck, Ex. D at 2) (emphasis added).

Nothing in this explanation relates to the three false statements. It is important to note that in disclaiming the second statement, Mr. Itay only took issue with the portion relating to the disabling of the contact field. (*Id.* 79:15–24). Indeed, Mr. Itay *affirmed* the accuracy of the statement "the contact field which is fixedly connected to the semiconductor device ..." (*Id.* 70:15–25). T–Mobile ultimately

presents no argument regarding the content of the Notice of Allowability, instead relying on the theory that, because these misstatements appeared in the amendment, and because the amendment led to approval of the patent, the misstatements must have been the *sine qua non* of the approval. But this is not logically consistent in light of the fact that the amendment also clarified that the contacts were "fixedly connected to the semiconductor device [for] *during both said contact and contactless modes* ..." (Shuman Decl., Ex. C. at 1) (amendment in underline). The Notice of Allowability makes unambiguous that this language, the language affirmed by Mr. Itay, was the pivotal clarification resulting in approval of the patent.

While the misstatements in the amendment may fall far short of candor, the Court does not need to dive into the murky waters of intent because T–Mobile has failed to create a genuine dispute of material fact regarding but-for causation and would be unable to meet the inequitable conduct defense's clear and convincing standard at trial.

#### 4. Summary

In summation, OTI's motion for summary judgment on T–Mobile's affirmative defenses of laches, estoppel, acquiescence, patent misuse, and inequitable conduct is GRANTED in its entirety.

### D. Remaining Motions to Exclude Expert Testimony

Having resolved the motions directly pertaining to the question of patent infringement and validity, and T–Mobile's affirmative defenses on those issues, the Court turns to the two outstanding motions to strike testimony relating to damages. These motions are controlled by Federal Rule of Evidence 702 and the same legal principles applied to Dr. Apsel's expert testimony. *See supra* Section III. A.1.

▇▇ Because the expert testimony at issue here relates to compensation for the '043 patent, it is also worth noting certain legal principles relevant to determining damages for patent infringement. The patent laws state that, upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. A "reasonable royalty" is typically derived from a hypothetical negotiation between the patentee and the infringer when the infringement began. *See, e.g., Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 (Fed.Cir.1995). This is "determined not on the basis of a hindsight evaluation of what actually happened, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiations." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed.Cir. 1983). A comprehensive list of relevant factors for a reasonable royalty calculation appears in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970).

▇▇ "Determining a fair and reasonable royalty is often ... a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge." *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir.1988). Still, a reasonable royalty analysis requires a court to hypothesize, not to speculate. *Id.* at 1575. At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention. *See, e.g., Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) ("[T]he present statutory rule is that only 'damages' may be recovered.").

## 1. OTI's Motion to Strike the Testimony of Mr. Davies

OTI seeks to strike the rebuttal testimony of Dr. Michael Allan Martin Davies. For the reasons below, OTI's motion is GRANTED IN PART and DENIED IN PART.

### i. The Davies Report

Mr. Davies' testimony touches on a number of distinct issues. In Section B, Mr. Davies provides a history of NFC technology and the NFC market. (Dkt. No. 170 ("Lin Declaration"), Ex. E at 14–39). In Section C, Mr. Davies describes the costs incurred by phone manufactures for the "bill of materials" necessary to produce NFC-capable mobile phones. (*Id.* at 46–53). Section D addresses possible alternative technology that T–Mobile could have used for the ISIS Mobile Wallet. (*Id.* at 54–77). Finally, Section F addresses the current state of the NFC market in the United States and how it has failed to meet projected estimates. (*Id.* at 83–99).

OTI proffers several arguments against this testimony, one of which is specific to a particular section, while the remainder are general to Mr. Davies' testimony as a whole. The Court begins by addressing the narrower argument.

### ii. Post–Infringement Information Is Excluded From Davies' Testimony

█ It is black letter law that expert testimony must be relevant in order to be admissible. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589–91, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). *See also* Fed. R. Evid. 702 (evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."). OTI attacks Section E of Mr. Davies' report, which opines that NFC adoption has not reached expected esti-

mates in the United States, as containing irrelevant testimony. Specifically, OTI takes issue with Mr. Davies' use of market data that postdates any hypothetical royalty negotiation that OTI and T–Mobile would have engaged in and, it contends, would therefore not have impacted the mindset of the parties at the time of the negotiation. (Lin Decl., Ex. E at 78–97).

The law on this issue is far from clear. OTI cites to *Riles v. Shell Exploration & Prod. Co.,* 298 F.3d 1302, 1313 (Fed.Cir. 2002) for the proposition that "[a] reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment." *See also Integra LifeSciences I Ltd. v. Merck KGaA,* 331 F.3d 860, 869–70 (Fed.Cir.2003) *vacated on other grounds* 545 U.S. 193, 125 S.Ct. 2372, 162 L.Ed.2d 160 (2005) ("A reasonable royalty calculation envisions and ascertains the results of a hypothetical negotiation between the patentee and the infringer at the time before the infringing activity began."); *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1384–85 (Fed.Cir.2001) (fact that a party did not meet projections was irrelevant to state of mind at the time of hypothetical negotiation and rather reflected the uncertainty inherent in projections).

T–Mobile cites to *Fromson* for the proposition that determining a reasonable royalty rate "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Fromson,* 853 F.2d at 1578. OTI dismisses *Fromson* as an old case that T–Mobile has elected to misinterpret. But this is not so. Although not noted by either party, in 2005, the Federal Circuit held that a district court had properly interpreted *Fromson* and other precedent as "mandating consideration of a

hypothetical negotiation on the date of first infringement *but not automatically excluding evidence of subsequent events.*" *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed.Cir.2005) (emphasis added). Even more recently, the Federal Circuit has reaffirmed that "our case law affirms the availability of post-infringement evidence as probative in certain circumstances." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir.2009) (citing *Fromson*, 853 F.2d at 1575). *Lucent Tech.* provides only that such post-infringement evidence "ought to be given its proper weight, as determined by the circumstances of each case." *Id.* at 1334.

■■■ Unsurprisingly, the apparent tension between these cases has generated significant confusion in the district courts.[22] "In spite of ... much case law, disputes continue over the consideration of ex post information." John C. Jarosz, Michael J. Chapman, *The Hypothetical Negotiation and Reasonable Royalty Damages: The Tail Wagging the Dog*, 16 Stan. Tech. L.Rev. 769, 803 (2013). *See also BASF Corp. v. Aristo, Inc.*, 07–cv–222 (PPS), 2012 WL 2529213, at *2 (N.D.Ind. June 29, 2012) (noting that while courts are supposed to focus on the parties' states of mind at the time of negotiation, "caselaw [ ] cuts in the other direction" as well). Accordingly, most district courts conclude that they have the discretion, but not the obligation, to consider post-negotiation evidence in calculating a reasonable royalty. *See, e.g., Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F.Supp.2d 459, 466 (D.Del.2005). The Court joins in that conclusion and therefore must exercise its discretion in determining whether post-infringement information is admissible as part of Mr. Davies' testimony.

*Fromson* offers some useful guidance on this question. The *Fromson* court was concerned that in some circumstances, patent holders would be undercompensated by a hypothetical royalty negotiation pegged to the date of infringement. The hypothetical negotiation framework fictionally posits that both parties were willing to negotiate at the time of the first infringement, when in fact, the *Fromson* court noted, a patent holder may be inclined to hold to her rights while the value of her patent appreciates. *Fromson*, 853 F.2d 1568 (citing to *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698–99, 53 S.Ct. 736, 77 L.Ed. 1449 (1933)). As the

---

**22.** *See, e.g.,* Michael J. Carrozza, *Are Royalties Reasonable in Patent Infringement Suits? Using Hindsight at the Hypothetical Negotiating Table,* 12 J. Marshall Rev. Intell. Prop. L. 241, 248 (2012) ('Courts view the hypothetical negotiation differently, resulting in disagreement as to what evidence should be admissible to calculate reasonable royalties. Some appear to interpret the hypothetical negotiation literally while others appear to view it as a mere figurative construct. As a corollary, the former refuse to allow post-negotiation information into the calculations while the latter welcome it.); D. Christopher Holly, *The Book of Wisdom: How to Bring A Metaphorical Flourish into the Realm of Economic Reality by Adopting A Market Reconstruction Requirement in the Calculation of A Reasonable Royalty,* 92 J. Pat. & Trademark Off. Soc'y 156, 170 (2010) ('The court in Fromson explicitly establishes that an infringer's profits are available in calculating a reasonable royalty and appears to ground this assertion in Sinclair's book of wisdom language. However, the Fromson holding provides no guidance as to the appropriate considerations or analytical framework to be employed by courts when considering the issue.); Thomas F. Cotter, *Four Principles for Calculating Reasonable Royalties in Patent Infringement Litigation,* 27 Santa Clara Computer & High Tech. L.J. 725, 761 (2011) ('To the extent such ex post developments are relevant to determining what the parties' expectations may have been ex ante ... such developments sometimes may be helpful in reconstructing the terms of the hypothetical ex ante bargain. Courts nevertheless should be wary of the risk of hindsight bias.')

court cogently summarized in *Honeywell Int'l*:

> If the hypothetical negotiation could not be informed by post-negotiation information, then prospective infringers might perceive 'that blatant, blind appropriation of inventions ... is the profitable, can't-lose course.' In other words, prospective infringers might rationally conclude that, at worst, upon a finding of infringement 'a license can be compelled, probably at the same royalty that would have been paid if the patentee's rights had been respected at the outset.' Moreover, the [considering post-infringement information] prevents the hypothetical negotiation method from determining a reasonable royalty at a point in time before the patent has proven its worth.

378 F.Supp.2d at 465.

▮▮ Accordingly, post-negotiation information is relevant if it helps determine the true value of a patent, particularly when it would otherwise be undervalued by pegging the hypothetical negotiation to the date the infringing party elected to infringe. This has the added benefit of deterring infringement. A case within the Second Circuit, written by Judge Scheindlin, explains why post-infringement information is less relevant in other situations.

> It is not surprising that when the infringer has profited from its wrongful use of a competitor's intellectual property, and sometimes quite handsomely, the injured party urges that those profits reflect the damages it has suffered. Many cases recognize this self-evident proposition ... The situation is entirely different when the infringer has not profited from its wrongful conduct ... when there are no profits, an event that the parties could not have anticipated at the time of the hypothetical negotiations, admission of this evidence would be highly prejudicial to the victim of the alleged infringement. The intellectual property had a theoretical value at the time it was stolen. There are many reasons why the infringer may not have profited once it commercialized the idea and sold the product.

*LinkCo, Inc. v. Fujitsu Ltd*, 232 F.Supp.2d 182, 190 (S.D.N.Y.2002) (emphasis added)

▮▮ This reasoning emphasizes that post-infringement information is at its most relevant when the infringer experienced a windfall as a result of their misconduct. Comparatively, it is less relevant when it is being presented by the infringer to emphasize the lack of damages caused by their own infringement. Such is the case here. As Judge Scheindlin reasoned in *LinkCo, Inc v. Fujitsu Ltd.*, the subsequent lack of profits from T–Mobile's infringement could have occurred for "many reasons" unrelated to the value of the underlying patent. Those reasons should not excuse T–Mobile from the deal they would have struck in a reasonable negotiation without knowledge that the product would ultimately not meet projections.

Moreover, T–Mobile has not put forward a compelling reason as to why such post-infringement information is needed to determine a reasonable royalty rate. Rather, they contend that subsequent sales data "appropriately confirm the accuracy of T–Mobile's and Isis's less optimistic projections ..." (T–Mobile Opp. 9 n.1). But business projections carry with them an attendant level of risk and uncertainty, and allowing T–Mobile to introduce post-infringement data tending to confirm those projections unfairly tips the scales in their favor. Any projections existing prior to the infringement can be considered on their own terms, but it is prejudicial to OTI to allow T–Mobile to substitute educated guesswork regarding the patent's market value with confirmed fact.

Accordingly, the Court agrees with OTI that any reference to information the parties would only have learned about *after* the hypothetical negotiation occurred (in early 2012), or any of Mr. Davies' testimony based upon such information, should be stricken. This includes, at least, paragraphs 127, 140, 210–14, 269–70, and 272–275. Because several of these paragraphs refer to date ranges including both permissible and impermissible information—e.g. "Forecasts of Isis mobile wallet subscribers made between 2009 and 2013 were continually revised downward ..." (Lin Decl., Ex. E ¶ 210)—T–Mobile and Mr. Davies are granted leave to amend the report to bring it into compliance with this order.

### iii. Mr. Davies is an Expert and Has Used Proper Methodology

In addition to the specific argument above, OTI proffers several attacks against Mr. Davies' testimony generally. First, OTI contends that Mr. Davies is not an expert on the subject matter at issue and that he fails apply any methodology in reaching his conclusions. (OTI Mem. 12). The Court disagrees that Mr. Davies is not an expert. The Federal Rules allow for an individual to be qualified as an expert through possession of "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Moreover, within the Second Circuit, courts liberally construe expert qualification requirements in determining whether a witness can be deemed an expert. *See Nosal,* 269 F.R.D. at 287. Mr. Davies' possesses degrees in electrical sciences and engineering from the University of Cambridge and the University of Durham. (Dkt. No. 187, Ex. 5 at 1). Additionally, he has an MBA from the London Business School. (*Id.*). He has taught engineering-specific entrepreneurial courses at MIT and the London Business School. (*Id.* at 7). Moreover, he has been an advisor to leading market actors in the NFC field for several decades. (*Id.*

at 5). In the context of a hypothetical negotiation between T–Mobile and OTI regarding the value of the '043 patent, Mr. Davies' background in the electrical engineering marketplace seems to make him a particularly well-qualified witness. *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.,* MDL No. 1358, 2008 WL 1971538, at \*5 (S.D.N.Y. May 7, 2008) (noting that "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience rather than formal education.") (citing *Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 591 (7th Cir.2000)).

As to his methodology, the Federal Rules anticipate that "[s]ome types of expert testimony will not rely on anything like a scientific method." *Id.* at \*6 (quoting Fed. R. Evid. 702 Advisory Committee Note). While the requirement of reliability "applies equally when an expert's testimony is not scientific in nature" the four *Daubert* factors "may not be applicable when assessing the testimony of non-scientific experts." *Id.* at \*3. *See also Houlihan v. Marriott Int'l, Inc.,* 00–cv–7439 (RCC), 2003 WL 22271206, at \*3 (S.D.N.Y. Sept. 30, 2003) (concluding that although a court "*may* look to the *Daubert* criteria when evaluating the admissibility of nonscientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination."); *WeddingChannel.Com, Inc. v. The Knot, Inc.,* 03–cv–7369 (RWS), 2005 WL 165286, at \*6 (S.D.N.Y. Jan. 26, 2005) ("in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods") (citation removed).

While *Kumho Tire* reaffirmed that the district court must act as a gatekeeper for *all* expert testimony, not merely scientific testimony, it also affirmed that the *Dau-*

*bert* factors "do *not* constitute a definitive checklist." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The ultimate question is whether Mr. Davies' testimony is "properly grounded, well-reasoned, and not speculative." Fed. R. Evid. 702 Advisory Committees Note. *See also Louisiana Wholesale Drug Co. v. Sanofi–Aventis*, 07–cv–7343 (HB), 2008 WL 4580016, at *6 (S.D.N.Y. Oct. 14, 2008) ("The standard to evaluate non-scientific expert testimony is whether the expert bases testimony upon professional studies or personal experience and employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

The Court concludes that Mr. Davies' testimony is properly-grounded, well-reasoned, and not speculative. He has extensive academic and business experience in the relevant field. Drawing upon this wealth of experience, he has opined on a range of relevant subjects that are likely to assist a jury in assessing any damages from T–Mobile's assessment. To the extent OTI disputes his conclusions, their proper recourse is vigorous cross-examination.

#### iv. Mr. Davies' Report Improperly Presents Certain Underlying Facts

▪ OTI's next line of attack is that Mr. Davies' testimony is not helpful to the jury because so much of it is simply a recitation of fact. It is well established that "[t]estimony is properly characterized as "expert" only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir.2008) (citing *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.1994)). Similarly, "[s]imply rehashing evidence about which an expert has no personal knowledge is impermissible under Rule 702."

*Sharkey v. J.P. Morgan Chase & Co.*, 978 F.Supp.2d 250, 252 (S.D.N.Y.2013). *See also Highland Capital Mgmt., L.P. v. Schneider*, 379 F.Supp.2d 461, 469 (S.D.N.Y.2005) ("An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."). Nor may a putative expert simply theorize as to a party's intent based on the factual record. Such "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Products Liab. Litig.*, 309 F.Supp.2d 531, 547 (S.D.N.Y.2004).

OTI contends that "[m]obile phones are ubiquitous consumer devices that jurors undoubtedly have and use regularly. Because sales of cell phones, their cost, and their capabilities, are well within the jurors' grasp, they do not need Davies' assistance—all these are routine facts." (OTI Mem. 15). This line of thinking is an oversimplification. Everyday items and their basic functionality may be well known to laypeople, but that does not mean that issues affecting their design, manufacture, or marketplace are similarly understandable. *Cf. Coffey v. Dowley Mfg., Inc.*, 187 F.Supp.2d 958, 972 (M.D.Tenn.2002) *aff'd*, 89 Fed.Appx. 927 (6th Cir.2003) (noting that the automobile is an "ubiquitous machine in our modern society" but that expert testimony is still required to explain the "complex failures of simple products" in products liability context).

But OTI's criticisms of Mr. Davies' testimony are closer to the mark where it claims that "[t]o the extent Davies' opinions are based on what T–Mobile employees told him, those employees are free to present those opinions, together with facts from associates documents to the jury themselves." (OTI Mem. 16). T–Mobile attempts to rebut this by contending that their expert reached his conclusions *re-*

*gardless* of his conversations with these employees and that their conversations were merely confirmatory. (*See* T–Mobile Opp. 19) That is all well and good, but Mr. Davies may not bootstrap such statements into his report in order to confirm his own expert opinions. T–Mobile is of course free to call these employees to the stand and to have them testify to facts supportive of Mr. Davies' conclusions. For instance, at one point in his report, Mr. Davies states, "Brian Bell, T–Mobile's Isis Business Development Manager, testified that research has shown that 'the Isis mobile wallet would not be a deciding factor for a consumer to buy a phone or a certain type of phone." (Lin Decl., Ex. E ¶ 268). There is absolutely no reason that Mr. Bell himself cannot testify to that fact or that T–Mobile cannot introduce the "research" demonstrating that fact. It is not appropriate to put an "expert gloss on this testimony." *United States v. Christian,* 673 F.3d 702, 711 (7th Cir.2012).

This flaw is not fatal to the entirety of Mr. Davies' testimony, however. In reviewing his report, it is clear that Mr. Davies' conclusions are drawn not exclusively from T–Mobile employees, but rather primarily from his own business experience and familiarity with the NFC market. Accordingly, the Court does not exclude the entirety of Mr. Davies' report. However, to the extent the report simply parrots the testimony of Mr. Bell it must be excluded. This includes, at a minimum, the offending portions of paragraphs 27, 28, 30, 149, 268, and 275.

■ Next, OTI argues that Mr. Davies' testimony on the "bill of materials" is inadmissible, because it is not expert testimony to simply regurgitate the cost of an item, a fact verifiable by other means. But this ignores the context in which Mr. Davies' raises these figures. The parties clearly dispute the extent to which mobile payment systems constituted a significant business opportunity to T–Mobile and its competitors. At least one consideration in that dispute is how central the mobile payment function was to T–Mobile's other products and services. Mr. Davies looked at the cost and number of components in the relevant phones and, in conjunction with his own understanding of the NFC marketplace, offered an opinion on the significance of ISIS as a business opportunity to T–Mobile. While the bills of materials themselves do not constitute expert opinions, there can be no dispute that "expert opinions must provide the underlying facts and basis of the expert's opinions." *Langille v. McLane Foodservice, Inc.,* 12–cv–189, 2014 WL 2892657, at *5 (D.Wyo. Apr. 18, 2014) (citing *U.S. v. R.J. Reynolds Tobacco Co.,* 416 F.Supp. 316, 325 (D.N.J. 1976) ("Opinions are valueless as evidence without exploration of the underlying facts and rationale showing the path from the facts to the opinion.").

Finally, OTI challenges Mr. Davies' conclusions and "Summary of Opinions" section, alleging that they do not constitute expert opinions. These summary statements and conclusions are merely reflective of the contents of Mr. Davies' broader testimony. Accordingly, this allegation is duplicative of OTI's other theories. To the extent these summary and conclusion passages contain information excluded by this order, then they must be amended or excluded. For instance, Mr. Davies' conclusion that adoption of NFC mobile technology in the United States "has been lower than anticipated" (Lin Decl., Ex. E ¶ 3) must be excluded to the extent it relies on information from after the hypothetical negotiation date. But OTI has not put forward any other independent reason for excluding these summary statements.

### v. Mr. Davies' Testimony Constitutes Rebuttal Testimony

■ "The function of rebuttal evidence is to explain or rebut evidence offered by

the other party." *United States v. Casamento,* 887 F.2d 1141, 1172 (2d Cir.1989). Accordingly, the "standard for a rebuttal expert witness is the same as for any expert witness, though the expert's testimony should be to explain, repel, counteract or disprove evidence presented by the expert to whom he or she is responding." *Faulkner v. Arista Records LLC,* 46 F.Supp.3d 365, 386 (S.D.N.Y.2014) (citing *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 759 (8th Cir.2006)). OTI argues that "Davies cannot rebut Dr. Meyer's royalty analysis because [sic] has no opinion on the amount of a reasonable royalty." (OTI Mem. 19). This argument is without merit. Both Mr. Davies and T–Mobile acknowledge that the Davies Report does not contain its own proposed reasonable royalty amount (Lin Decl., Ex. B 25–26; T–Mobile Opp. 21). This alone does not mean that Mr. Davies' testimony does not serve to rebut many of the key assumptions undergirding Dr. Meyer's proposed royalty.

### vi. The Court Reserves Its Ruling On the Prejudice of Mr. Davies' Testimony

OTI's final criticism of Mr. Davies' testimony is that it is unduly prejudicial. The Federal Rules require the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of ... needlessly presenting cumulative evidence." Fed. R. Evid. 403. As OTI properly notes, "[m]ultiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative. It also raises the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *Sunstar, Inc. v. Alberto–Culver Co.,* 01–cv–736, 2004 WL 1899927, at *25 (N.D.Ill. Aug. 23, 2004). But it is also the case that experts may opine on the same topic without being duplicative "inasmuch as each brings a different perspective from different fields of expertise." *Treaster v. Healthsouth Corp.,* 05–cv–2061 (JWL/G), 2006 WL 1580980, at *2 (D.Kan. June 5, 2006).

The Court will not exclude Mr. Davies' testimony on the grounds of prejudice at this time, but the Court will not allow overly duplicative testimony at trial. *See, e.g., AUSA Life Ins. Co. v. Dwyer,* 899 F.Supp. 1200, 1203 n. 3 (S.D.N.Y.1995) (noting that to the extent an expert offers admissible, but duplicative, testimony, the Court will exclude such testimony at trial).

### vii. Summary

In summation, the bulk of Dr. Davies' testimony is admissible under Rule 702. As explained above, it is stricken only to the extent that it (a) relies upon or references information that post-dates the hypothetical negotiation date or (b) the extent to which it parrots the testimony of Mr. Bell.

### 2. T–Mobile's Motion to Exclude the Damages Opinion of Dr. Meyer

▮ T–Mobile moves to exclude the damages opinions of Dr. Christine Meyer on the grounds that it fails to rely on sufficient facts or data and is therefore unreliable. *See* Fed. R. Evid. 702(b). Their motion is GRANTED.

### i. Background

In her report, Dr. Meyer employs a hypothetical negotiation construct to assess what reasonable royalty rate the parties would have agreed to had they negotiated an agreement on the eve of infringement. Dr. Meyer first determines the range for such a royalty by determining the *lowest* rate that OTI would have accepted, while still leaving it better off than in the absence of a negotiation, and the *highest* rate that T–Mobile would have paid, while still leaving it better off

as well. (Dkt. No. 180 ("Dixon Declaration"), Ex. 2 ¶¶ 13–23). Next, she applied the fifteen *Georgia–Pacific* factors (*Id.* 23–35) to conclude that T–Mobile and OTI would have negotiated a royalty agreement whereby T–Mobile paid OTI a running royalty rate of $0.49/unit in addition to a one-time lump sum payment of $4 million. (*Id.* ¶¶ 35–37).

Dr. Meyer calculated her proposed running royalty rate by reference to the *Georgia–Pacific* factors. She first considered the "royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." *Georgia–Pacific*, 318 F.Supp. at 1120 (Factor 1). Dr. Meyer noted that OTI had previously granted two licenses for the '043 patent, one in 2002 to China Integrated Design Centre ("CIDC") and another in 1998 (although it was later amended in 2011) to Samsung Electronics, Co., Ltd. ("Samsung"). (Dixon Decl., Ex. 2 ¶¶ 55–57). The ongoing royalty rate for the CIDC license [redacted text] (*Id.* ¶ 56). Dr. Meyer's report does not disclose the precise terms of the Samsung license, but does note that it included [redacted text] (*Id.* ¶ 57). The 2011 amendment resulted in [redacted text] Samsung to OTI. (*Id.*).

Dr. Meyer concluded that neither of these licenses constituted an "established rate" for purposes of analysis under *Georgia–Pacific* for several reasons. First, both licenses related to a smart card, rather than a mobile payment system. Second, both licenses were part of a broader cooperative business relationship between OTI and the licensees, and third, the agreements were negotiated a decade or

more before the hypothetical negotiation date at issue in this case. (*Id.* ¶¶ 56, 58).

In lieu of an established rate set by prior licensing agreements, Dr. Meyer proceeded to consider a 2007 offer from Via Licensing Corporation ("Via") for a "joint licensing program" that provided access to a pool of patents that were "essential" for the practice of NFC. (*Id.* ¶ 69). Dr. Meyer considered this licensing offer under *Georgia–Pacific* factors number 12 and 13.[23] She noted that for consumer devices, such as cell phones, Via offered a pool license or an "a la carte" license, with the latter offering single patents for a tenth the cost. (*Id.* ¶ 71). Dr. Meyer determined that, although there is only one patent at issue in this case, the reasonable royalty rate likely exceeded both the a la carte and pool licensing rate offered by Via, because (1) Via could not guarantee the validity of the patents in the pool; (2) T–Mobile possessed a strong preference for the use of the SIM Card as the secure element; (3) the fact that the Via rates did not discriminate by application; and (4) the Via rate was first offered at a time when NFC was undeveloped and thus less valuable. (*Id.* ¶ 72).

Finally, Dr. Meyer analyzed other agreements entered into by ISIS with vendors and third parties needed to create a cashless payment ecosystem, although she acknowledged that these agreements did not concern patent licenses. (*Id.* ¶ 74). However, she noted that these agreements at the very least demonstrated that ISIS, and subsequently T–Mobile, were willing to pay rates of [redacted text] (depending on volume) per wallet as a royalty rate to important project partners, in addition to a

**23.** '12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.' *Georgia-Pacific,* 318 F.Supp. at 1120.

[redacted text] annual per wallet royalty (again, depending on volume) for development of a support application. (*Id.*). Accordingly, Dr. Meyer concluded that the Via licensing pool fee schedule was an appropriate proxy for the '043 patent.[24]

#### ii. Discussion

T–Mobile begins its assault upon Dr. Meyer's report by cautioning that "district courts performing reasonable royalty calculations exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869–70 (Fed.Cir.2010). This is because basing a reasonable royalty calculation off "a loose or vague comparability between different technologies or licenses" results in an arbitrary result. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed.Cir.2012).

T–Mobile argues that it was inappropriate for Dr. Meyer to rely upon the Via licensing pool for a myriad of reasons. First, it contends that beyond observing that the patents in the Via licensing pool were "essential patents for the practice of NFC," Dr. Meyer otherwise had no idea which specific patents were included in the patent pool. (T–Mobile Mem. 10–13). Second, it criticizes her decision to adopt the pool license rate, which was approximately ten times the rate offered by Via for an a la carte license. (*Id.* 13–14). And third, T–Mobile emphasizes that Dr. Meyer proffered no evidence of anyone ever actually accepting any of the NFC licensing offers made by Via and that accordingly there is no proof that the rates offered were "customary." (*Id.* 14–16).

Although Dr. Meyer has given compelling reasons both as to why the CIDC and Samsung licenses failed to create an established royalty rate and as to why T–Mobile may be inclined to pay a substantial royalty, her proposed running royalty rate testimony must be excluded. Ultimately, the Via licensing scheme is nothing more than an unconsummated offer ·indicating what Via *hoped* to collect for the patent pool. Even more significantly, it is a technological black box that provides absolutely no basis for comparison to the technology of the '043 patent. Although the Court finds her reasoning credible as to why licensing rates for important NFC technology patents were likely more valuable in 2012 than in 2007, that does not change the fact she began her analysis from a completely unsubstantiated starting point. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 871 (Fed.Cir.2010) (criticizing an expert's valid downward revision of a reasonable royalty rate from an unsubstantiated starting point).

OTI contends that such an unconsummated offer can inform an expert's reasonable royalty assessment and cites to *Oracle Am., Inc. v. Google Inc.*, 798 F.Supp.2d 1111, 1121 (N.D.Cal.2011) for support. Although that case also involved a *Daubert* motion, the facts were determinedly different from the case at bar. In *Oracle*, the two parties, Google and Sun (later acquired by Oracle), had actually engaged in real world negotiations, including a series of offers and counter-offers. *Id.* at 1114. Accordingly, the court concluded that "[g]iven the presence *in this case of a real-world "comparable" close on point*—the last Sun offer in 2006—the Court is strongly of the view that the hypothetical negotiation should take that $100 million offer as the starting point and adjust . . ." *Id.* at 1121 (emphasis added). The court in *Oracle* was clearly aware that using an unconsummated offer "in this case" was

---

**24.** The fee schedule provided for a $0.490 fee per device up to one million device and, a $0.368 per device fee for volume ranging from 1,000,001 devices to ten million. (Lin Deel., Ex. 2 ¶ 73).

only appropriate because the parties' themselves had shown their cards through a back-and-forth negotiation. No such negotiation exists here. The Via licensing offer was made by a non-party, to the market at large, without any back-and-forth negotiation, for a set of patent products not at issue in this case.

OTI cites no other authority for the proposition that a non-party's unconsummated offer for a *potentially* similar product could serve as reliable evidence for an expert's reasonably royalty analysis. As a result, this portion of Dr. Meyer's report relies entirely on speculative underpinnings, including the comparability of the Via patents to the '043 patent and the actual fair market value of a Via license. Such underpinnings fail to meet Rule 702's foundational requirement that such opinions be based on sufficiently reliable facts or data. Accordingly, Dr. Meyer's proposed licensing rate must be excluded.

Dr. Meyer's testimony regarding a hypothetical $4 million lump sum payment must similarly be excluded. Dr. Meyer concluded that in addition to a running royalty rate comparable to the Via licensing offer, T–Mobile would have been willing to pay an additional lump sum payment because (1) it had exhibited a willingness to make substantial upfront payments in ISIS, (2) the importance of the '043 patent technology to feasibility of ISIS, and (3) the significant profits T–Mobile expected to reap from the ISIS mobile wallet. (Dixon Deck, Ex. 2 ¶ 79). Dr. Meyer noted that, in addition to these substantial outlays in anticipation of marketing ISIS, [redacted text] to support the final development of the ISIS mobile wallet. (*Id.* ¶ 42 n.65). Accordingly, she concluded that, in addition to the running royalty rate, a $4 million lump sum payment would have been "reasonable." (*Id.* ¶ 80).

Despite the shortcomings of her analysis regarding a reasonable running royalty rate, Dr. Meyer at least went to some length in establishing a foundation for her opinion. Conversely, here, the Court cannot help but wonder from whence the $4 million figure sprang. Dr. Meyer's testimony provides, quite literally, no explanation and thus fails to meet Rule 702's requirements that such testimony be based on "sufficient facts and data" and that it be the "product of reliable principles and methods." Fed. R. Evid. 702(b)-(c).

Evidently the sum bears some relation to the [redacted text] but Dr. Meyer does not explain why T–Mobile would allocate [redacted text] to the '043 patent, not to mention whether this cushion was even intended to be allocated towards IP licenses in the first place. Dr. Meyer appears to have simply treated the cushion as proverbial spare change in T–Mobile's couch and guessed that it would spent about [redacted text] to license the '043 patent. In her deposition testimony Dr. Meyer explained that the purpose of the cushion was to anticipate unforeseen expenses, such as the '043 patent. (Dixon Decl., Ex. 11 at 204:2–8). That may well be the case, but that does not allow an expert to simply pick a number, any number, between one and eight million. Even though Dr. Meyer has appropriately identified factors indicating that T–Mobile would have been willing to spend substantial resources to secure valuable IP licenses, her report ultimately provides no roadmap to the $4 million sum. Simply put, that number "appears to have been plucked out of thin air." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed.Cir.2012) (concluding that reasonable royalty analysis failed to meet *Daubert* standard due the complete lack of economic analysis quantitatively supporting the royalty estimate). Accordingly, this portion of Dr. Meyer's testimony also fails to meet Rule 702's rigor.

### iii. Dr. Meyer's Testimony Does Not Violate the Total Market Rule

In addition, the parties dispute whether or not it was proper for Dr. Meyer to consider T–Mobile's total investment and expected returns from ISIS in calculating her royalty rate. T–Mobile contends that it was an inappropriate application of the entire market value rule, while OTI contends that Dr. Meyer did not apply this rule. Generally, upon a finding of infringement, the patent laws dictate that the court "shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer ..." 35 U.S.C. § 284. This means that "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for noninfringing components of that product. Thus, it is generally required that royalties be based not on the entire product, but instead on the smallest salable patent-practicing unit." *LaserDynamics, Inc.*, 694 F.3d at 67. The entire market value rule is an exception to this and holds that when it can "shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." *Id.*

*LaserDynamics* is illustrative of this principle. That case concerned a patent relating to optical disk drives ("ODDs") on laptop computers. ODDs allow the laptop owner to use optical disks to play certain media, such as CDs or DVDs, or to operate certain software. *LaserDynamics, Inc.*, 694 F.3d at 68. The court took issue with an expert's calculation of a royalty sum based on the Defendant's total revenues from selling laptop computers, despite the fact that such computers offered "a plethora of features" any number of which "could be deemed to drive demand for the entire product." *LaserDynamics Inc.*, 694 F.3d at 68. The Court concluded, "proof that consumers would not want a laptop computer without [one of these features] is not tantamount to proof that any one of those features alone drives the market for laptop computers." *Id.*

The Court concludes that Dr. Meyer did not, in fact, apply the entire market value rule in her analysis. T–Mobile notes that, in her testimony, Dr. Meyer acknowledged that many technical elements of the NFC smartphones are not accused of infringing the '043 patent. (Dixon Deck, Ex. 2 ¶ 34). And yet she does not ascribe any value to these technological elements in discussing T–Mobile's "expectations ... for the commercial success and profitability of the Isis mobile wallet." (*Id.* ¶ 64). But Dr. Meyer considered this anticipated profit only as to what royalty rate T–Mobile would have been willing to pay OTI to use the '043 patent technology—not as to establishing a royalty base. Rather, she appropriately focused on the "smallest salable patent-practicing unit," the NFC phone operating in conjunction with the SIM card. (*Id.* ¶ 80).

T–Mobile argues that the entire market value rule only concerns the royalty base and notes that OTI fails to cite any precedent to this effect. OTI's failure to do so is somewhat puzzling, as Federal Circuit case law clearly cuts against T–Mobile's position. For instance, in *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed.Cir. 1995) the Federal Circuit approved an expert's consideration, for purposes of calculating a reasonable royalty rate, of the substantial profits an infringer stood to gain on collateral sales related to the patent. Subsequent decisions of the Federal Circuit have interpreted *Rite–Hite* as

standing for the proposition that "the relevance of anticipated collateral sales to the determination of a reasonable royalty *rate* is not to be confused with the application of the entire market value rule to a determination of a royalty base." *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1373 n. 6 (Fed.Cir.2008) (citing *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1559 (Fed. Cir.1983)) (internal quotations removed) (emphasis in original). Other Federal Circuit cases flatly state that the entire market value rule is relevant "in determining the appropriate basis for calculating a royalty base the court may use ..." *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed.Cir.2001). *See also Code–Alarm, Inc. v. Electromotive Technologies Corp.*, 114 F.3d 1206 (Fed.Cir.1997) ("The entire market value rule is an acceptable method for calculating a reasonable royalty base ... A trial court may include non-infringing sales in the calculation of this royalty base when the infringing components are the basis for customer demand for the entire machine."); *Cornell Research Found., Inc. v. Hewlett–Packard Co.*, 501–cv–1974 (NAM), 2007 WL 4349135, at *59 (N.D.N.Y. Jan. 31, 2007) ("Plaintiffs' royalty base calculation implicates a theory which has been labeled as the "entire market value rule", and finds its roots in several Federal Circuit cases, including *Rite–Hite* as well as several earlier decisions from that court.").

*Lucent Technologies* confirms that that the entire market value rule relates only to the calculation of the royalty base. In that case, Lucent's expert changed his testimony at trial, increasing his proposed royalty rate from 1% to 8% based on the court's rejection of his application of the entire market value rule to the royalty base. The court chastised the expert for trying "to reach the damages number he would have obtained had he used the price of the entire computer as a royalty base. Being precluded from using the computer as the royalty base, he used the price of the software, but inflated the royalty rate accordingly. This cannot be an acceptable way to conduct an analysis of what the parties would have agreed to in the hypothetical licensing context." *Lucent Technologies, Inc.*, 580 F.3d at 1338.

This Court adopts the reasoning of *Rite–Hite* and *Lucent Technologies* in concluding that Dr. Meyer did not in fact apply the entire market value rule, because she considered T–Mobile's investment in ISIS, and its anticipated revenue, only in the context of what reasonable royalty rate T–Mobile would have been willing to pay in a hypothetical negotiation. While this proper adhesion to the Federal Circuit's precedent does not resuscitate Dr. Meyer's flawed report, it should be noted if the parties proceed to trial on the question of damages.

## IV. CONCLUSION

In conclusion, for the reasons above, T–Mobile's motion to strike the testimony of Dr. Apsel is DENIED. OTI's motion for summary judgment on infringement is GRANTED. T–Mobile's motion for summary judgment on non-infringement and invalidity is DENIED, although T–Mobile may still prove invalidity at trial. OTI's motion for summary judgment on T–Mobile's fourth through ninth affirmative defenses is GRANTED. OTI's motion to strike Mr. Davies' testimony is GRANTED IN PART and DENIED IN PART. T–Mobile's motion to strike the Dr. Meyer's damages opinions is GRANTED.

The parties are further ORDERED to appear for a status conference before the Court on April 24, 2015 at 11:00am. In advance of the conference, the parties shall meet and confer to discuss possible trial dates and a proposed schedule for pretrial submissions. The parties shall submit a joint letter by no later than April 8, 2015

outlining the proposed schedule and trial dates.

This resolves Dkt. Nos. 136, 141, 142, 144, 145, and 147.

SO ORDERED.